1  KEMNITZER, ANDERSON, BARRON, OGILVIE & BREWER, LLP
   Mark F. Anderson (SBN 44787)
2  445 Bush Street, 6th Floor
   San Francisco, CA 94108
3  Telephone: (415) 861-2265
   Facsimile: (415) 861-3151
4
   (Additional counsel appear on signature page)
5
   **Attorneys for Plaintiffs**
6
                **IN THE UNITED STATES DISTRICT COURT**
7            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8  KEVIN MORRIS, GLENN R.              :
   SEMOW and CHAD J. COOK,            :    CIVIL ACTION NO.
9  On Behalf Of Themselves And        :    07-CV-02827 (WHA)
   All Others Similarly Situated,     :
10                                     :    CLASS ACTION
                    Plaintiffs,        :
11                                     :    **PLAINTIFFS' NOTICE OF**
         vs.                           :    **MOTION, MOTION FOR**
12                                     :    **CLASS CERTIFICATION AND**
   BMW OF NORTH AMERICA, LLC,          :    **MEMORANDUM OF POINTS**
13                                     :    **AND AUTHORITIES**
                    Defendant.         :    **SUPPORTING MOTION**
14                                     :
                                       :    Hearing:  March, 6, 2008
15                                     :    Time:     8:00 a.m.
                                       :    Judge:    Hon. William A. Alsup
16                                     :    Courtroom: 9
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Standard For Class Certification . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.   This Action Meets The Requirements For Class Certification . . . . . 10

        1.   Joinder Of All Class Members Is Impracticable . . . . . . . . . . 10

        2.   Common Issues Exist And Predominate . . . . . . . . . . . . . . . . 10

            (a)   The Elements Of Plaintiffs' Claims . . . . . . . . . . . . . . 11

                1.   The Secret Warranty Act Claim . . . . . . . . . . . . 11

                2.   The Song-Beverly Act Claim . . . . . . . . . . . . . . 13

            (b)   Common Questions Of Law And Fact Predominate Over Any Questions Affecting Only Individual Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        3.   Plaintiffs' Claims Are Typical Of Those Of The Members Of The Class . . . . . . . . . . . . . . . . . . . . . . . . . 17

        4.   Plaintiffs And Their Counsel Will Adequately Represent The Class . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.   A Class Action Is Superior To All Other Methods For The Fair And Efficient Adjudication Of The Controversy And The Action Is Manageable . . . . . . . . . . . . . . . . . . . . . . . . . 20

    D.   Treatment Of This Case As A Class Action Is Manageable . . . . . . . 22

        1.   Liability Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        2.   Damages Phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amchem Products v. Windsor,*
521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Bates v. United Parcel Service,*
204 F.R.D. 440 (N.D.Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Burkhalter Travel Agency v. MacFarms Intern., Inc.,*
141 F.R.D. 144 (N.D. Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*California Rural Legal Assistance. Inc. v. Legal Servs. Corp.,*
917 F.2d 1171 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Chamberlan v. Ford Motor Company,*
402 F.3d 952 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Dellums v. Powell,*
566 F.2d 167 (D.C.Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Doe v. Los Angeles Unified Sch. Dist.,*
48 F.Supp.2d 1233 (C.D.Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . 10

*Eigen & Carlisle v. Jacqueline,*
417 U.S. 156 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*General Tel. Co. of Southwest v. Falcon,*
457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gulf Oil Co. v. Bernard,*
452 U.S. 89 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 20

*Hilao v. Estate of Marcos,*
103 F.3d 767 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ikonen v. Hartz Mountain Corp.,*
122 F.R.D. 258 (S.D.Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Chevron U.S.A., Inc.,*
109 F.3d. 1016 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Prudential Ins. Co. Am. Sales Practices Litig.*
148 F.3d 283 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Sugar Industry Antitrust Litigation,*
1976 WL 1374 (N.D.Ca. May 21, 1976) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jolley v. General Motors Corp.,*
55 N.C.App. 383, 285 S.E.2d 301 (1982) . . . . . . . . . . . . . . . . . . . . . . . 14

*Joseph v. General Motors Corp.,*
109 F.R.D. 635 (D. Colo. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lerwill v. Inflight Motion Pictures. Inc.,*
582 F.2d 507 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Samuel-Bassett v. Kia Motors America, Inc.,*
212 F.R.D. 271 (E.D.Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Segar v. Smith,*
738 F.2d 1249 (D.C.Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Simonelli v. University of California-Berkeley,*
2007 WL 3144863 (N.D.Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Walters v. Reno,*
145 F.3d 1032 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**STATE CASES**

*Annelli v. Ford Motor Company,*
2007 WL 3087959 (Conn.Super. 2007) . . . . . . . . . . . . . . . . . . . 13, 17, 18

*Bell v. Farmers Insurance Exchange,*
9 Cal.Rptr.3d 544 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Clothesrigger Inc. v. GTE Corp.,*
191 Cal.App.3d 605 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Earley v. Superior Court,*
79 Cal.App.4th 1420 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Isip v. Mercedes-Benz USA, LLC*
155 Cal.App.4th 19 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**STATUTES AND RULES**

Cal. Bus. & Prof. Code § 1795.90 . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cal. Bus. & Prof. Code §§ 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cal. Civ. Code § 1790 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Federal Rule of Civil Procedure 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**OTHER AUTHORITY**

American Jurisprudence Trials,
*Defective Tire Litigation*, 35 AMJUR TRIALS 603 (Nov., 2007) . . . . . . . . . . 14

Herbert B. Newberg & Alba Conte,
*Newberg on Class Actions* (4th ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Clarence Ditlow and Ray Gold,
*Little Secrets of the Auto Industry: Hidden Warranties Cost Billions of Dollars*
(1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1 | TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

2 | PLEASE TAKE NOTICE that, on March 6, 2008, at 8:00 a.m., or as soon

3 | thereafter as the matter may be heard, Plaintiffs, Kevin Morris, Glenn R. Semow

4 | and Chad J. Cook ("Plaintiffs"), will move for an Order of the Court, pursuant to

5 | Rule 23(b)(3) of the Federal Rules of Civil Procedure, certifying this case as a

6 | class action. The proposed class definitions are as follows:

7 | Turanza Class:

8 | All current and former owners and lessees of 2006 and 2007 BMW 3
9 | series vehicles equipped with Turanza EL42 RFT run-flat tires
manufactured by Bridgestone and sold or leased in California
10 | ("Turanza Class").

11 | Potenza Class:

12 | All current and former owners and lessees of 2006 and 2007 BMW 3
series vehicles equipped with Potenza RE050 run-flat tires
13 | manufactured by Bridgestone and sold or leased in California
("Potenza Class").

14 | Excluded from the Turanza Class and Potenza Class (collectively the "Classes" or

15 | the "Class") are Defendant, as well as Defendant's affiliates, employees, officers

16 | and directors, including franchised dealers, any person who has experienced

17 | physical injury as a result of the defects at issue in this litigation and the Judge to

18 | whom this case is assigned.

19 | This Motion for Class Certification is made on the grounds that, as set forth

20 | more fully in the accompanying Memorandum of Points and Authorities, class

21 | certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because

22 | the elements for class certification of numerosity, commonality, typicality and

23 | adequacy of representation all are met in this case. Furthermore, common issues of

24 | fact and law predominate over individual issues, a class action is superior to all

25 | other methods of adjudicating this controversy and this case is readily manageable

26 | as a class action. This Motion for Class Certification is based on the files, records

27 | and proceedings, this Notice of Motion, the Memorandum of Points and

28 | Authorities and Declaration of Mark F. Anderson (and accompanying exhibits)

1  submitted concurrently, such other matters as may be presented before or at

2  hearing and the argument of counsel.

3

**MEMORANDUM OF POINTS AND AUTHORITIES**
4  **IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

5  **I.     INTRODUCTION**

6          Plaintiffs, Kevin Morris ("Morris"), Glenn R. Semow ("Semow"), and Chad

7  J. Cook ("Cook") (collectively "Plaintiffs"), respectfully submit this Memorandum

8  of Points and Authorities in support of their Motion for Class Certification

9  ("Motion") pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.  For

10  the reasons explained fully below, the Court should grant the Motion.

11  **II.    SUMMARY OF ARGUMENT**

12          This is a class action arising as a result of an acknowledged defect with

13  Turanza and Potenza run-flat tires manufactured by Bridgestone Firestone North

14  America Tire, LLC ("Bridgestone") that came factory equipped on 2006 and 2007

15  3 series automobiles ("Vehicles") manufactured, marketed and/or sold by

16  Defendant, BMW of North America, Inc. ("BMW" or "Defendant").  As a result of

17  the defect, the tires wear unevenly and prematurely, resulting in Plaintiffs and other

18  putative Class members being required to replace them after as little as 10,000

19  miles, as well as being forced to endure an extremely rough ride and excessive

20  noise from the tires as they experience this premature and uneven wear.  BMW

21  became aware of the defect shortly after the Vehicles were brought to market and it

22  received, and continues to receive, numerous complaints from Vehicle owner and

23  lessees.  Despite its knowledge of the defect, BMW continued to sell the Vehicles

24  without disclosing the existence of the defect to owners, lessees or the consuming

25  public.  Nearly one year after first being placed on notice of the defect, BMW

26  issued a technical service bulletin to its authorized dealerships which

27  acknowledged the defect with the Turanza tires and stated the following: (1) the

28  corrective actions which BMW determined should be taken uniformly in an

1  attempt to address the defect; and (2) the level (albeit insufficient) at which owners

2  and lessees would be uniformly reimbursed for replacement tires by BMW under a

3  program it created to honor part (but not all) of its warranty obligations. BMW,

4  however, sought to minimize the expenses associated with this program by failing

5  and refusing to notify Vehicle owners and lessees of the existence of this program

6  and, instead, has operated the program in the manner of a secret warranty program

7  where consumers are offered the relief only if they happen to visit a dealer when

8  they are eligible for the inadequate relief offered by the program and the dealer

9  chooses to offer them that relief. As a result of BMW's conduct, at least hundreds,

10  if not thousands, of Class members have incurred costs for tire replacements,

11  alignments and related services that they should not have been required to incur.

12      The proposed Class of California owners and lessees in this case is

13  ascertainable and Plaintiffs' claims under the Motor Vehicle Warranty Adjustment

14  Programs Act ("Secret Warranty Act"), Civil Code § 1795.90 *et seq*., the Unfair

15  Competition Act, Business & Professions Code § 17200 ("UCL") and the Song-

16  Beverly Consumer Warranty Act ("Song-Beverly Act"), Civil Code § 1790 *et seq.*

17  all are susceptible to common proof. Moreover, the Class is represented by

18  appropriate and committed Class representatives who have retained counsel

19  experienced in prosecuting class actions. For these reasons, as well as all of the

20  reasons explained fully below, the Court clearly should grant Plaintiffs' Motion.[1]

21  **III.    STATEMENT OF FACTS**

22      Plaintiffs filed this class action against BMW as a result of the defective

23  nature of the Turanza and Potenza tires that came factory equipped on the

24

25  [1]Plaintiffs rely on the Declaration of Mark F. Anderson ("Anderson Decl."),
to which certain documentary evidence, other discovery materials and pleadings

26  [all of which are attached as Exhibits 1-10 and which are cited as "Anderson Decl.
at Ex. __"], as well as certain cited portions of deposition transcript of Frank

27  Gallacher ("Mr. Gallacher"), which is cited as "F. Gallacher Dep. at __" and

28  appears as Exhibit 11 to the Anderson Decl.

1    Vehicles.  The tires are all defective because they wear unevenly and prematurely,

2    resulting in Plaintiffs and other putative Class members being required to replace

3    them after as little as 10,000 miles, as well as being forced to endure an extremely

4    rough ride and excessive noise from the tires as they experience this premature and

5    uneven wear.  (First Amended Complaint ("FAC"), ¶ 2.)  BMW's own

6    documentary evidence confirms that the Turanza tires were the subject of

7    "[n]umerous complaints of uneven tire wear & noise beginning as low as 7000

8    miles."  (Anderson Decl. at Ex. 1; F. Gallacher Dep. at 92.)  Likewise, BMW has

9    received multiple complaints regarding premature wear on the Potenza tires.

10   (Anderson Decl. at Ex. 2) (confirming premature wear and excessive noise on

11   Potenza tires in January 2006 and noting that "the tire wear that is exhibited on

12   these tires is the same as all available tires for the [Vehicles]"); (Anderson Decl. at

13   Ex. 3)(confirming that premature wear on the Potenza tires was identical to the

14   premature wear on the Turanza tires).

15        Prior to marketing and selling the Vehicles to Plaintiffs, BMW knew, or

16   should have known, that the Turanza and Potenza run-flat tires were defective and

17   that wear requiring replacement after as little as 10,000 to 20,000 miles was not

18   consistent with the reasonable expectations of consumers regarding tread wear and

19   tire life.  (FAC, ¶¶ 23-24.)  This has been confirmed by BMW's internal email

20   correspondence regarding the Turanza and Potenza tires, in which it acknowledges

21   that consumers' reasonable expectation is that run-flat tires should last at least

22   37,000 miles:

23            Premature wear & reparability - we are replacing tires as early as
              10,000 - 12,000 km's for feathering and excessive tread wear. **Tires**
24            **often seem to be obsolete within 30,000 Kms.  Customers expect at**
              **least twice that range.**
25
26   (Anderson Decl. at Ex. 4)(emphasis added.)  Indeed, Mr. Gallacher, BMW's

27   Product Engineer principally responsible for dealing with this issue, acknowledged

28   that he believed a consumer should reasonably expect to get at least 28,000 to

32,000 miles from the Turanza tires. (F. Gallacher Dep. at 152-153.) Moreover, BMW never disclosed to consumers that the run-flat tires were inferior to conventional tires in terms of wear or useful life. On the contrary, BMW represented that "[t]he tread compound is the same as non-run-flats and ... customers can expect a tire life that is similar [to conventional tires]." (Anderson Decl. at Ex. 5); *see also* F. Gallacher Dep. at 155-156 (confirming that, all things being equal, he would expect a set of conventional tires to last the same mileage as a set of run-flat tires).[2] The problem with the premature wear and noise caused by the tires was well known to BMW, which, in addition to directly receiving thousands of complaints from consumers, was actively monitoring the myriad of complaints posted on various websites.[3] (Anderson Decl. at Ex. 7.)

BMW's express warranty does not cover tires.[4] (Answer, ¶ 53.) In January 2007, however, BMW secretly extended its express warranty to cover, under certain circumstances, the Vehicles equipped with Turanza tires. (FAC, ¶¶ 29-31.) Under the warranty extension, if an owner presents a Vehicle to a BMW dealer with prematurely worn or uneven Turanza tires with less than 10,000 miles on the odometer, BMW will pay for four new tires and all required labor. (*See* Technical

---

[2]BMW's failure to disclose the fact that the tires are defective and suffer from premature and uneven tire wear is particularly egregious because the run-flat tires are appreciably more expensive than conventional tires and, thus, owners and lessees of the Vehicles are not only required to replace the run-flat tires more frequently than anticipated, but they must also do so at an extraordinary expense. (FAC, ¶ 27; Anderson Decl. at Ex. 6 (cost of replacing four 16 inch Turanza tires is $776, and cost of replacing four 17 inch Turanza tires is $1020); F. Gallacher Dep. at 93-94.)

[3]BMW was receiving complaints regarding irregular tire wear as early as January 2006. (F. Gallacher Dep. at 60-61.)

[4]BMW admits "that the warranty supplied by BMW NA in connection with vehicles it distributes uses a standard form and is uniform." (Answer, ¶ 56.)

1  Service Bulletin SI B 36 06 06 ("TSB")(Anderson Decl. at Ex. 8).)  If the Vehicle

2  has between 10,000 miles and 20,000 miles, BMW will pay for two of the four

3  tires and all required labor. (*Id*.)  BMW notified its dealers of this new warranty

4  policy (referred to in the automobile industry as an adjustment program or secret

5  warranty) in writing, but it failed to notify owners that the express warranty was

6  being extended in this manner, as required by Civil Code § 1795.92(a) of the

7  Motor Vehicle Warranty Adjustment Programs Act ("Secret Warranty Act").

8  (FAC, ¶¶ 62-67; Answer, ¶¶ 31, 33.)[5]  BMW also violated § 1795.92(d) by failing

9  to implement a procedure for reimbursing the Vehicle owners and lessees who

10  previously paid for replacement of the Turanza tires. (*Id*., ¶ 68.) In this action,

11  Plaintiffs seek, *inter alia*, an order from this Court directing BMW to comply with

12

13

14      [5]As Clarence Ditlow and Ray Gold of the Center for Auto Safety ("CAS")
   explain in *Little Secrets of the Auto Industry: Hidden Warranties Cost Billions of*
15  *Dollars* (1994):

16          The expression, secret warranty, is not one used by auto companies --
17          they hate the term.  Auto companies substitute "policy adjustments,"
            "good will programs," or "extended warranties" for what is really a
18          secret warranty.  Whatever they are called, they are a longstanding
            industry practice.  When a car company that has a major defect that is
19          not covered by the written factory warranty or that occurs after its
20          factory warranty expires, it establishes an adjustment policy to pay for
            repairs rather than deal with thousands of complaints on a case by
21          case basis.  But the auto company communicates the policy to
22          regional offices and sometimes to its dealers; it never notifies the
            customer so only those who complain loudly enough get covered by
23          the secret warranty.  The rest end up bearing the costs of the
24          manufacturer's mistakes.
25

26  (*Id*. at 2.)  Clarence Ditlow, CAS's Executive Director, is quite familiar with secret
27  warranties -- he literally wrote the California Secret Warranty Act at issue in this
   case.  The evidence demonstrates that, regardless of what they call it, BMW clearly
28  adopted a secret warranty in this case.

1  the requirements of the Secret Warranty Act, as well as other relief under the UCL

2  and the Song-Beverly Act.

3      In addition to BMW's failure to comply with the requirements of the Secret

4  Warranty Act, the TSB itself does not provide an adequate remedy for Vehicle

5  owners and lessees with Turanza tires who, according to the terms of the TSB, are

6  still required to pay for fifty percent (50%) of the cost of the replacement tires if

7  they experience premature and/or irregular tire wear between 10,000 miles and

8  20,000 miles and all labor and parts charges in excess of 20,000 miles, which itself

9  constitutes a violation of the implied warranty of merchantability under the Song-

10 Beverly Act.  This is particularly true in light of BMW's own admission that

11 consumers reasonably expect a useful life of at least almost 40,000 miles from a set

12 of tires. (Anderson Decl. at Ex. 4.)[6]  Indeed, in the context of formulating the TSB

13 and negotiating with Bridgestone regarding its terms, a BMW representative stated

14 that "[w]ith the case of the Bridgestone Turanza we should ask for a mileage limit

15 of 30,000 miles" because "[w]e would expect a longer life from these all season

16 tires." (Anderson Decl. at Ex. 9.)  Moreover, the TSB does not expressly extend to

17 the Potenza tires,[7] which are also wearing irregularly at an unacceptable rate and

18 which should also be the subject of reimbursement.  (FAC, ¶¶ 30, 34.)

19     Plaintiffs' experiences with the tires have been typical.  Morris was required

20 to replace all four of his Turanza tires in March 2007 (at odometer reading 15,416)

21 because the tires were wearing prematurely and making excessive noise.  (FAC, ¶

22

23 ──────────────

24     [6]The FAC pleads that Plaintiffs and consumers reasonably expected that the
   tires on the Vehicles would not require frequent and extensive replacement (at a
25 significant cost) more frequently than, at a minimum, 40,000 to 50,000 miles.
   (FAC, ¶ 37.)
26

27     [7]The Potenza tires came standard on the Vehicles equipped with BMW's
   "Sport Package," see BMW's Answer at ¶ 22, and, as such, upon information and
28 belief, were factory equipped on significantly fewer Vehicles than the Turanzas.

1    42.)  Morris had to pay for two of the replacement tires at a cost of $450.  (*Id.*)

2    Similarly, Cook encountered premature wear on his Turanza tires.  In October

3    2006, Cook (at odometer reading 17,127) took his BMW to an authorized BMW

4    dealership, where the dealer noted that the "tires are worn" and "uneven."  (*Id.*, ¶

5    49.)  At that time, Cook declined to purchase new tires because of the excessive

6    cost.  (*Id.*)  Cook was not informed that the tires were defective.  (*Id.*)  Shortly

7    thereafter, on January 16, 2007, BMW implemented the TSB but failed to provide

8    Cook notice of the program's existence.  (*Id.*, ¶ 50.)[8]  Not having received notice of

9    the secret warranty, Cook purchased four new tires for his BMW on April 27,

10   2007, at a cost of $811.36.  (*Id.*, ¶ 51.)  Finally, Semow's Vehicle, which was

11   equipped with Potenza tires, also experienced premature wear.  After only 16,214

12   miles, two of the tires were so worn that Semow had to replace them at a cost of

13   $771.  (*Id.*, ¶ 45.)  BMW refused to reimburse Semow for the tires even though the

14   Potenza tires prematurely wear in precisely the same manner as the Turanza tires.

15   (*Id.*, ¶¶ 45, 72.)

16   **IV.    ARGUMENT**

17           **A.    Standard For Class Certification**

18           A plaintiff seeking to represent a class must first satisfy the requirements of

19   Rule 23(a) of the Federal Rules of Civil Procedure, by showing that:  (1) the class

20   is so numerous that joinder of all members is impracticable; (2) there are questions

21   of law or fact common to the class; (3) the claims of the representative parties are

22   typical of the claims of the class; and (4) the representative parties will fairly and

23   adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  In addition, the

24

25           [8]Had BMW complied with its legal obligation to provide notice of the
     adjustment program, Cook would have taken his Vehicle to a dealership to have his
26   four prematurely worn tires replaced.  (*Id.*)  So long as it complied with the terms
     of its adjustment program, BMW would have paid for the labor and two of the four
27   tires because the mileage on Cook's Vehicle did not exceed 20,000 miles until after
28   BMW implemented the TSB.  (*Id.*)

1  plaintiff must show that the case can proceed as a class action under subparts (1),

2  (2), or (3) of Rule 23(b).  Plaintiffs' action satisfies the requirements of Rule

3  23(b)(3).

4       In deciding a motion for class certification, the Court must avoid pre-judging

5  the merits, and must assume the truth of the substantive allegations of Plaintiffs'

6  complaint. *See Eigen & Carlisle v. Jacqueline*, 417 U.S. 156, 177-78 (1974);

7  *Burkhalter Travel Agency v. MacFarms Intern., Inc.*, 141 F.R.D. 144, 152 (N.D.

8  Cal. 1991).  "The court is bound to take the substantive allegations of the

9  complaint as true, thus necessarily making the class order speculative ..." *Blackie v.*

10  *Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir. 1975), *cert. denied*, 429 U.S. 816

11  (1976).  It also is well established that the Court's decision to grant class

12  certification lies within its sounds discretion. *See Gulf Oil Co. v. Bernard*,  452

13  U.S. 89, 100 (1981).  Moreover, any doubts about whether to certify a class should

14  be resolved in favor of certification. *Joseph v. General Motors Corp.,* 109 F.R.D.

15  635, 638 (D.Colo. 1981).  Here, Plaintiffs propose the following Classes:

16          Turanza Class:

17          All current and former owners and lessees of 2006 and
18          2007 BMW 3 series vehicles equipped with Turanza
        EL42 RFT run-flat tires manufactured by Bridgestone
19          and sold or leased in California.

20          Potenza Class:

21          All current and former owners and lessees of 2006 and
        2007 BMW 3 series vehicles equipped with Potenza
22          RE050 run-flat tires manufactured by Bridgestone and
        sold or leased in California.

23  Excluded from the Classes are Defendant, as well as Defendant's affiliates,

24  employees, officers and directors, including franchised dealers, any person who

25  has experienced physical injury as a result of the defects at issue in this litigation

26  and the Judge to whom this case is assigned.  The Classes that Plaintiffs propose in

27  this Motion clearly meet the objective criteria and all of the requirements of Rule

28  23(b)(3) of the Federal Rules of Civil Procedure.

**B.    This Action Meets The Requirements For Class Certification**

**1.    Joinder Of All Class Members Is Impracticable**

To satisfy the Rule 23(a)(1) requirement that joinder of all members of the class is impracticable -- commonly referred to as "numerosity" -- "[t]he exact size of the class need not be known so long as general knowledge and common sense indicate that it is large." *Doe v. Los Angeles Unified Sch. Dist.*, 48 F.Supp.2d 1233, 1239 (C.D.Cal. 1999); *see also Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D.Cal. 1988) ("classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstance of each case, and classes of 40 or more are numerous enough"); 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.05 at 247 (4th ed. 2002) ("[A]s few as 40 class members should raise a presumption that joinder is impracticable."). Here, BMW cannot reasonably dispute that joinder of all members of the Class is impracticable and has acknowledged that, with respect to this element, "there are numerous current and former owners and lessees of 2006 and 2007 BMW 3 series vehicles equipped with Turanza and/or Potenza run-flat tires sold or leased in California." (Answer, ¶ 13.) Moreover, as discussed below, notwithstanding the large size of the Class, it clearly is not too numerous to manage effectively. Consumer classes are typically large and classes of tens and hundreds of thousands of members are routinely certified. *See Chamberlan v. Ford Motor Co.*, 223 FRD 524 (N.D.Cal. 2004) (granted certification of class of more than 150,000 consumers); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (affirmed certification of consumer class of 3.3 million mini-van owners); *Clothesrigger Inc. v. GTE Corp.*, 191 Cal.App.3d 605 (1987) (reversing trial court's denial of certification of nationwide consumer class of over 1 million consumers).

**2.    Common Issues Exist And Predominate**

To fulfill the commonality prerequisite, a plaintiff must establish that there are questions of law or fact common to the class as a whole. Rule 23(a)(2). The

1  commonality element, however, does not require that the claims of every class

2  member present identical questions. It is enough to satisfy commonality that

3  plaintiffs share one common issue of law or fact and their "'situations are

4  sufficiently parallel to insure a vigorous and full presentation of all claims for

5  relief.'" *California Rural Legal Assistance. Inc. v. Legal Servs. Corp.*, 917 F.2d

6  1171, 1175 (9th Cir. 1990)(internal quotations omitted); *see also* 1 Herbert B.

7  Newberg & Alba Conte, Newberg on Class Actions § 3.10 at 274-278 (4th ed.

8  2002) ("Rule 23(a)(2) is easily met in most cases [and] [w]hen the party opposing

9  the class has engaged in some conduct that affects a group of persons and gives

10  rise to a cause of action, one or more elements of that cause of action will be

11  common to all of the persons affected."). Thus, variations among Class members'

12  circumstances do not defeat class certification. Instead, the commonality inquiry

13  "focuses on the relationship between the common and individual issues [and]

14  [w]hen common questions present a significant aspect of the case and they can be

15  resolved for all members of the class in a single adjudication, there is clear

16  justification for handling the dispute on a representative rather than on an

17  individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)

18  (citations and quotations omitted). Here, the claims pursuant to which the Turanza

19  Class and Potenza Class seek relief readily lend themselves to common legal and

20  factual issues and will be established by the same common proof.

21  **(a)     The Elements Of Plaintiffs' Claims**

22  **1.     The Secret Warranty Act Claim**

23  The unlawful prong of the UCL "borrows violations of other laws and treats

24  them as practices that the unfair competition law makes independently actionable."

25  *Cal. Consumer Health Care Council v. Kaiser Found. Health Plan, Inc.*, 142

26  Cal.App.4th 21, 27 (2006). Here, Cook asserts violations of the Secret Warranty

27  Act (rendered operative by the UCL) on behalf of the Turanza Class, which

28  requires companies that create an "adjustment program" notify, *inter alia*,

consumers and dealers of the program in order to enable claims by customers who bought a vehicle subject to the program and who paid for repairs for conditions subject to the program to file a claim with the company. Cal. Civ. Code § 1795.92(a)-(e). An adjustment program is defined as follows:

> Any program or policy that expands or extends the consumer's warranty beyond its stated limit or under which a manufacturer offers to pay for all or any part of the cost of repairing, or to reimburse customers for all or any part of the cost of repairing, any condition that may substantially affect vehicle durability, reliability, or performance, other than service provided under a safety or emission-related recall.

Cal. Civ. Code § 1795.90(d). The Secret Warranty Act requires a manufacturer to "notify by first-class mail all owners or lessees of motor vehicles eligible under the program of the condition giving rise to and the principal terms and conditions of the program." Cal. Civ. Code § 1995.92(a). Pursuant to the Secret Warranty Act, consumers who incur expenses for repairing a condition subject to the adjustment program, prior to learning of the program, are permitted to file a claim for reimbursement with the manufacturer. Cal. Civ. Code § 1795.92(d)-(e).

Here, it is clear that the TSB issued by BMW in January 2007 constituted an adjustment program. First, BMW's express warranty, as the TSB itself acknowledges, does not cover tires: "***Tires are warranted by their manufacturer and not by BMW of North America*** [and] [t]his type of irregular wear is not covered by the normal tire warranty." (*See* Anderson Decl. at Ex. 8 (emphasis added); *see also* BMW's Answer at ¶ 53.) Thus, by offering reimbursement for the prematurely worn Turanza tires, BMW is extending "the consumer's warranty beyond its stated limit" and has implemented an adjustment program under the Secret Warranty Act. Similarly, the TSB also constitutes an adjustment program because it reimburses "customers for all or any part of the cost of repairing, any condition that may substantially affect ... performance" of the Vehicles. In addition to constituting an adjustment program, as the Court noted in its decision on Defendant's Motion to Dismiss, it is undisputed that BMW has not provided

1   notice of the TSB to consumers as required by the Secret Warranty Act. (*See*
2   November 7, 2007 Order at 10; *see also* BMW's Answer at ¶ 31.)  Based on these
3   elements, Plaintiffs' claim under the Secret Warranty Act lends itself to
4   straightforward common questions of fact and law as follows:
5   (1) whether the TSB constituted an adjustment program; (2) whether BMW
6   provided notice of the TSB; and (3) the remedies available if BMW violated the
7   Secret Warranty Act.
8       In *Annelli v. Ford Motor Company*, 2007 WL 3087959 (Conn.Super. 2007),
9   the court certified a class under Connecticut's Secret Warranty Act, Gen. Stat. §
10  42-227, in connection with an adjustment program involving owners and lessees of
11  model year 1992-2003 "panther-platform" vehicles.  In holding that the
12  commonality element was satisfied, the Court stated:

> In the present case, the court concludes that the plaintiff has
> established that there are numerous questions of law and fact common
> to the class, including but not limited to: whether the defendant's TSB
> constitutes and adjustment program within the meaning of and
> pursuant to the Secret Warranty Act ... whether the plaintiff and the
> class are entitled to the benefits provided under the TSB ... whether
> the defendant failed to notify consumers about their eligibility for the
> repair programs and/or failed to reimburse consumers who incurred
> the costs of the repairs covered under the programs ... whether the
> plaintiff and the class suffered an ascertainable loss  ... and lastly, the
> damages suffered.

19  *Id.* at *8.  The same analysis holds true in this case.

20                  **2.    The Song-Beverly Act Claim**

21      Plaintiffs' claim for breach of implied warranty under the Song-Beverly Act
22  is similarly well suited for class treatment.  By operation of law, BMW provided
23  buyers an implied warranty of merchantability on the entire Vehicle, including the
24  tires.  Under the Song-Beverly Act, an "implied warranty of merchantability"
25  implies that goods will be "fit for the ordinary purposes for which such goods are
26  used." Civil Code § 1791.1(a)(2).  Here, the FAC alleges, *inter alia*, that the
27  Turanza and Potenza run-flat tires cause vibration and excessive noise while
28  wearing unevenly and prematurely and requiring frequent replacement of all four

1   tires after as little as 10,000 to 20,000 miles or less.  (FAC ¶¶ 23-25); *see also*

2   BMW's Answer at ¶ 2 (acknowledging excessive noise complaints); *see Isip v.*

3   *Mercedes-Benz USA, LLC*, 155 Cal.App.4th 19, 27 (2007)(holding that if a vehicle

4   or product is not "substantially free of defects," the implied warranty of

5   merchantability is breached); *see also Jolley v. General Motors Corp.*, 55

6   N.C.App. 383, 285 S.E.2d 301 (1982)(acknowledging that breach of implied

7   warranty claim could be stated if evidence established that automobile or tire was

8   defective when it left manufacturer's plant or that manufacturer was negligent in its

9   design of automobile, its selection of materials, its assembly process or inspection);

10  American Jurisprudence Trials, *Defective Tire Litigation*, 34 AMJUR TRIALS 603

11  (November, 2007)(internal citations omitted)("A seller of goods, including tires,

12  impliedly warrants that they are suitable for the ordinary purpose for which they

13  are used.... [and] [t]o make out a case of breach of implied warranty, the plaintiff

14  must prove that the goods bought and sold were subject to an implied warranty in

15  that the goods were defective at the time of sale, that injury was caused by the

16  defective nature of the goods, and that damages were suffered as a result").

17      As a result of the problem with the Turanza tires, these tires (which came in

18  16 and 17 inch sizes) were redesigned.  (F. Gallacher Dep. at 54-60.)  The

19  redesigned 17 inch tires became available to the market in January 2007, while the

20  redesigned 16 inch tires are just now, as of January 2008, being made available to

21  consumers.  (F. Gallacher Dep. at 54-58.)  Although BMW had received numerous

22  complaints about the 16 inch Turanza tires, BMW dealerships were still using the

23  defectively designed tires as replacement tires under the TSB.[9]  (F. Gallacher Dep.

24

25      [9]Similarly, as a result of complaints regarding irregular tire wear on the
26  Potenza tires, although not expressly included in the TSB, BMW made numerous
    goodwill accommodations to Vehicle owners and lessees who were required to
27  replace their Potenza tires as a result of irregular tire wear.  (Anderson Decl. at Ex.
28  3.)

1  at 57.)

2      Based on these elements, Plaintiffs' claims under the Song-Beverly Act lend

3  themselves to straightforward common questions of law and fact as follows:  (1)

4  whether the tires were the subject of an implied warranty;[10] (2) whether the tires

5  were defective at the time of sale; (3) whether injury was caused by the defective

6  tires; and (4) the amount of damages suffered.  Accordingly, Plaintiffs' Song-

7  Beverly Act claim should be certified.

8            **(b)**    **Common Questions Of Law And Fact Predominate Over Any Questions Affecting Only Individual**

9                   **Members**

10      Plaintiffs' claims focus upon the uniform manner in which BMW

11  implemented the TSB and marketed and sold the Vehicles with the defective

12  Turanza and Potenza tires.  As the Court in *Chamberlan v. Ford Motor Company*,

13  402 F.3d 952, 962 (9th Cir. 2005) (where the court denied a petition for

14  interlocutory review of a class action alleging that the defendant knowingly

15  manufactured, sold and distributed automobiles containing an engine part with a

16  uniform design defect), recently and cogently explained:

17       The district court's decision in this case is typical in that it presents no error of law and is not manifestly erroneous.  Although the district

18       court was succinct, it provided detailed, substantive examples of the common issues: (1) whether the design of the plastic intake manifold

19       was defective; (2) whether Ford was aware of alleged design defects; (3) whether Ford had a duty to disclose its knowledge; (4) whether it

20       failed to do so; (5) whether the facts that Ford allegedly failed to disclose were material; and (6) whether the alleged failure to disclose

21       violated the CLRA.  The common issues here are plain enough that no further explanation is required to justify the district court's decision....

22       Requiring the district court to expand its analysis would produce nothing more than a lengthy explanation of the obvious.

23

24  Similarly, here, the common issues of law and fact that predominate in this action

25  are as follows:

26 ———————————

27     [10]Since BMW does not assert that it sold the tires on the Vehicles "as is" "or

28  with all faults," under the Song-Beverly Act, it is beyond cavil that they were subject to the implied warranty of merchantability.  Civ.Code §§ 1791.3, 1792.

- • Whether the TSB constituted an adjustment program;

- • Whether BMW provided notice of the adjustment program;

- • Whether the tires were the subject of an implied warranty of merchantability;

- • Whether the tires were defective at the time of sale; and

- • Whether Plaintiffs and Class members have been damaged.

Any argument that BMW may make regarding the purported need to examine individual driving habits of Vehicle owners and lessees was flatly, and properly, rejected in *Samuel-Bassett v. Kia Motors America*, Inc., 212 F.R.D. 271, 282 (E.D.Pa. 2002), *vacated on other grounds*, 357 F.3d 392 (3[d] Cir. 2004). There, owners and lessees asserted claims, including for breach of express warranty, in connection with a defective brake system on Kia's Sephia vehicles (sold between 1995 and 2001). In certifying the class, the Court rejected Kia's argument that individual driving habits precluded a finding that common issues predominated:

> In this case, while the defendant has strenuously argued that this case does not satisfy Rule 23(b)(3) because the merits of each individual car owner's complaints must be evaluated along with their individual driving habits and conditions, we nevertheless find from the evidence amassed thus far that the questions common to the class clearly predominate over those which only affect certain individual owners. To be sure, there is but one model at issue in this case, manufactured at Kia's Korea plant.... *While Defendant is no doubt correct that each vehicle was driven differently by different drivers in different locations and that the vehicles manifested varying symptoms such as pulsating, grinding, vibration, and failure to stop, there is nonetheless more than sufficient indicia that a vast number of those Sephias manufactured and sold between 1995 and 2001 experienced some or all of the above symptoms and were subject to the wear-out of their brake pads and rotors before reaching the 5,000 mile mark regardless of who was driving them or where or how they were being driven.*
>
> \*      \*      \*
>
> We thus conclude that the questions of whether the Sephia possesses the brake system defect alleged and whether Defendant lacks the means to repair the defect or replace the defective brake system such as to render it liable for beach of express and implied warranties ... do predominate over those issues unique to individual claims.

1  (*Id.* at 282)(emphasis added and footnote omitted.)  Here, similarly, Plaintiffs'

2  Song-Beverly Act Claims assert that the tires themselves were defective at the time

3  of sale, irrespective of driving habits of individual Vehicle owners and lessees.

4       The documents produced by BMW, as well as its admissions, demonstrate

5  that a determination as to whether the TSB constituted an adjustment program and,

6  if so, whether BMW complied with its obligations under the Secret Warranty Act, is

7  particularly well-suited for class-wide adjudication.  Similarly, the issue of whether

8  the inclusion of the tires on the Vehicles at the time of sale violated the implied

9  warranty of merchantability is equally well-suited for a determination on a class-

10  wide basis.  In sum, common issues of law and fact clearly predominate because

11  Plaintiffs will prove their claims through proof regarding BMW's uniform conduct.

12  All of the questions identified above compose the core issues in this litigation and

13  are susceptible to common proof.[11]

14       **3.    Plaintiffs' Claims Are Typical Of Those Of The Members Of
             The Class**

15       Rule 23(a)(3) requires that the claims of the representative plaintiffs be

16  typical of those of the class.  Commonality and typicality "tend to merge," such that

17  factors that support a finding of commonality also support a finding of typicality.

18  *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 (1982).  Plaintiffs

19  demonstrate typicality by showing that the "unnamed class members have injuries

20  similar to those of the named plaintiffs and that the injuries result from the same,

21  injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir.

22  2001), cert. denied, 537 U.S. 812 (2002).  The typicality requirement is satisfied

23

24

25  [11]As the court in *Annelli, supra,* noted with respect to certifying a secret
warranty act claim: "In regard to plaintiff's cause of action under Connecticut's

26  Secret Warranty Act, the issue of whether the TSB and upgrade program are

27  'adjustment programs' can be resolved with generalized proof.  It is a fact specific
inquiry that may be resolved through the defendant's corporate records." *Id.* at

28  *12.

1  where "the representative [p]laintiffs, as well as the members of the proposed class,
2  all have claims arising from the fraudulent scheme perpetrated by [the defendant]."
3  *In re Prudential Ins. Co. Am. Sales Practices Litig.* 148 F.3d 283, 311 (3d Cir.
4  1998).

5        Here, with respect to the Secret Warranty Claim, Cook did not receive notice
6  of the adjustment program and was, therefore, required to pay out-of-pocket to
7  replace the defective Turanza tires that came factory equipped on his Vehicle.
8  Accordingly, he stands in precisely the same position as all other Turanza Class
9  members that he seeks to represent on this claim.  Similarly, Cook and Morris, on
10  behalf of the Turanza Class, and Semow, on behalf of the Potenza Class, all
11  purchased or leased Vehicles that were subject to the same implied warranty of
12  merchantability as the Vehicles owned or leased by the respective Class members
13  that they seek to represent, *see* Answer, ¶ 56 (acknowledging uniform express
14  warranty and, therefore, any disclaimer of implied warranty (which does not exist)
15  also would be uniform) and were equipped with the same defective tires as the
16  Vehicles of the respective Class members they seek to represent.

17        Under similar facts and circumstances, the court in *Annelli, supra,*
18  determined that the typicality element in a secret warranty act claim was easily
19  satisfied: "Here, both the plaintiff and the proposed class' allegations arise from the
20  same factual contention that the defendant failed to notify them about their
21  eligibility for the repair programs ... and/or failed to reimburse them for the costs
22  they incurred for the repairs.... [and] [t]he ***plaintiff's claims are more than just***
23  ***typical*** of the claims of other proposed class members -- ***they are identical***." *Id.* at
24  *9 (emphasis added).  For the same reasons, Plaintiffs' claims here are typical of
25  those of the Classes which they seek to represent.

26
27
28

1

### 4.    Plaintiffs And Their Counsel Will Adequately Represent The Class

2

The adequacy requirement of Rule 23(a)(4) is met if a plaintiff fulfills two

3

conditions: (a) the plaintiff's attorneys must be qualified, experienced, and

4

generally able to conduct the proposed litigation; and (b) the plaintiff must not have

5

interests antagonistic to those of the class. *Lerwill v. Inflight Motion Pictures, Inc.*,

6

582 F.2d 507, 512 (9th Cir. 1978).  Here, Plaintiffs are represented by counsel who

7

are qualified and possess substantial experience in the conduct of litigation of the

8

size, scope, and complexity of this case in general and consumer class actions in

9

particular. (Anderson Decl. at Ex. 10; *see also* Answer, ¶ 16 ("BMW NA admits

10

plaintiffs have retained attorneys experienced in class action and complex

11

litigation.").)  As to the second prong of the "adequacy" test, only a conflict that

12

goes to the very subject matter of the litigation will defeat a party's claim of

13

representative status.  Factual differences in the merits of the named plaintiff's

14

underlying claims do not affect the plaintiff's ability to vigorously represent the

15

class. *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1997).  Here, Plaintiffs do not

16

have any conflicts with the members of the Class.  Plaintiffs' injuries are essentially

17

the same as those of the members of the proposed Class.  Plaintiffs have, and will

18

continue to, vigorously pursue relief on behalf of the proposed Classes as evidenced

19

by their conduct of the litigation to date.[12]  Moreover, Plaintiffs are able and willing

20

to prosecute this case and to protect the interests of the Classes.

21

22

23

24

25

26

[12]Plaintiffs also note that each of them has appeared during the last week for

27

deposition or is appearing for deposition on dates and at locations convenient for Defendant's counsel during the next week, thereby further demonstrating their

28

commitment to this case.

PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION, AND MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOTION
*Morris et al. v. BMW of North America, LLC*, Civil Action No. 07-CV-02827 (WHA)                **Page 19**

C.    **A Class Action Is Superior To All Other Methods For The Fair And Efficient Adjudication Of This Controversy And The Action Is Manageable**

Weighing heavily in favor of class certification is the fact that certification of Plaintiffs' claims is the only economically feasible method for the fair and efficient adjudication of this controversy. Any individual Class members' damages remain modest relative to the time and expense required to properly prosecute these claims, as well as BMW's financial resources and the millions of dollars generated by its sale of these Vehicles. Individual Class members have no economic ability or incentive to wage costly and complex litigation against a well-financed Defendant such as BMW. Rule 23(b)(3) requires the court to determine whether "a class action is superior to other available methods for a fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The four specific factors listed in the rule compel the conclusion that a class action is superior to resolve the claims of Plaintiffs and the proposed Classes. The first factor is the interest of each member in "individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Here, the interest of Class members in individually controlling separate actions is minimal: while the aggregate damages of the Class are significant, the damages of each individual Class member will be relatively small. Given the expense of securing counsel and pursuing claims separately, Class members have little interest in maintaining individual, non-personal actions. *Hanlon,* 150 F. 3d at 1023 ("even if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs [since] [i]n most cases, litigation cost would dwarf potential recovery [and] [i]n this sense, the proposed class action is paradigmatic."). Indeed, the Supreme Court has recognized that, absent class treatment, similarly situated consumers with relatively small but nevertheless meritorious claims for damages would, as a practical matter, have no means of redress because of the time, effort and expense required to prosecute individual

actions. As the Supreme Court noted in *Amchem Products v. Windsor*, 521 U.S. 591 (1997), Rule 23(b)(3) aims primarily at vindicating "the rights of groups of people who individually would be without effective strength to bring their opponent into court at all." The Supreme Court declared cases like this one to be paradigms for class treatment:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. The class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem*, 521, U.S. at 617 (internal quotations omitted). This action is just such a "core" class action. Few of the present Class members could afford to undertake individual litigation against BMW to recover the relatively small damages at issue, but the failure to recover such damages is a real hardship to many people. If the class device were unavailable here, an economic injustice would result -- the Class members would, as a practical matter, have no meaningful redress against BMW and BMW would be unjustly enriched by the profits gained from its misconduct.

The second factor, "the extent and nature of any litigation concerning the controversy already commenced" by members of the Class, also supports proceeding with this action. To Plaintiffs' knowledge, there are no other actions currently pending involving either of the Classes.

The third factor is the desirability "of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). This forum is undoubtedly an appropriate forum for the resolution of Plaintiffs' claims because all of the Plaintiffs reside in the State where this District is located and it is desirable for BMW to address claims under California law against it in this District.

The fourth and final factor is "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). As discussed below,

1  this action is exceedingly manageable and the claims for which Plaintiffs seek class

2  certification are all based on the same set of operative facts.

3       **D.    Treatment Of This Case As A Class Action Is Manageable**[13]

4       To date, the parties have encountered no difficulties in managing this case as

5  a class action and this case easily can be tried and adjudicated on a Class-wide

6  basis.  As the California Court of Appeals noted in *Earley v. Superior Court,* 79

7  Cal. App. 4th 1420, 1434 (2nd Dist. 2000), a class action can be tried as to liability

8  and damages with Plaintiff acting as the fiduciary on behalf of the class:

9           A class action is a representative action in which the class
            representatives assume a fiduciary responsibility to prosecute the
10          action on behalf of the absent parties. The representative parties not
            only make the decision to bring the case in the first place, but even
11          after class certification and notice, they are the ones responsible for
            trying the case, appearing in court and working with class counsel on
12          behalf of absent members.... The very purpose of the class action is to
            relieve the absent members of the burden of participating in the
13          action. (Citations and parentheticals omitted.)

14  Plaintiffs propose that the trial of this action be bifurcated into (1) a liability phase

15  (including a determination of injunctive relief) and (2) a damages phase.

16  Bifurcation of class actions into a liability phase and a damages phase is widely

17  recognized and accepted.  *See Bates v. United Parcel Service*, 204 F.R.D. 440, 448

18  (N.D.Cal. 2001).

19       **1.    Liability Phase**

20       The liability phase will consist of a bench and jury trial.[14]  The central issues

21

---

22       [13]Upon certification, Plaintiffs will meet and confer with Defendant to create

23  an appropriate plan to provide notice of certification to the Classes and will then

24  submit the same to the Court for its review and approval.  Plaintiffs (a) note that
    the Secret Warranty Act essentially contains a notice plan provision, and (b) third

25  parties, including R.L. Polk & Co., www.polk.com, maintain databases to identify

26  and notify Class members of their rights to the extent that a defendant's records are
    incomplete.

27

28       [14]If the Court so chooses, it may elect to submit the equitable issues that are
    within its own jurisdiction (*i.e.*, the Secret Warrant Act and UCL claim) to an

1  to be determined in the liability phase are as follows for the respective claims:

2  **Secret Warranty Claim**

3  (1) whether the TSB constituted an adjustment program;[15] and

4  (2) the remedies available if BMW violated the Secret Warranty Act.

5  **Song-Beverly Claim**

6  (1) whether the tires were the subject of an implied warranty;

7  (2) whether the tires were defective at the time of sale;

8  (3) whether injury was caused by the defective tires; and

9  (4) the amount of damages suffered.

10  Plaintiffs will prove BMW's liability through a number of methods, including,

11  *inter alia*, the presentation of BMW's own documents and records, deposition and

12  witness testimony (including BMW's representatives and the Plaintiffs) and expert

13  testimony. Plaintiffs do not anticipate that the liability phase of the trial would be

14  markedly more complex than any consumer product case and reasonably believe

15  that the liability phase can be tried in approximately five (5) to seven (7) days.

16  **2.    Damages Phase**

17  The second phase of the trial will focus on the Classes' damages. The

18  central issue to be determined in the damages phase is the amount of damages and

19  ───────────────

20  advisory jury pursuant to Fed.R.Civ.P. 39(c). *See Simonelli v. University of*
21  *California-Berkeley*, 2007 WL 3144863 * 3 (N.D.Cal. October 23, 2007).
   Plaintiffs believe that, since the claims asserted are closely related, this approach
22  may make particular sense from a perspective of judicial economy and so that the
23  jury hearing evidence regarding the breach of implied warranty claims and the
   Secret Warranty Act claims is able to fully understand the relationship between
24  these claims in the context of responding to jury interrogatories, certain of which
25  would be completed in an advisory role.

26  [15]BMW admits that it did not provide notice of the TSB and did not create a
27  mechanism to reimburse customers who did not receive notice of the TSB and,
   accordingly, these issues need not be adjudicated during the liability phase. *See*
28  BMW's Answer at ¶¶ 31, 33.

1   relief to which the members of the Classes are entitled.  Plaintiffs will provide the

2   jury and Court with a basis to calculate Class-wide damages though the

3   presentation of data and statistics (through experts), as well as, *inter alia*, evidence

4   regarding the effect of the defect at issue, repair and replacement costs and product

5   purchase price.  *See* 3 Newberg on Class Actions § 10.5 at 483-487 (4th ed.

6   2002)(there is a growing trend in favor of using aggregate damages trials).  It is

7   well settled that the calculation of damages on a Class-wide basis is both proper

8   and does not create manageability problems.  *See, e.g., In Re Sugar Industry*

9   *Antitrust Litigation*, 1976 WL 1374, *27 (N.D.Ca. May 21, 1976)(citations

10  omitted); *Bell v. Farmers Insurance Exchange*, 9 Cal.Rptr.3d 544 (2004)("We find

11  little basis in the decisional law for skepticism regarding the appropriateness of the

12  scientific methodology of inferential statistics as a technique for determining

13  damages in an appropriate case").  This method has been approved by the leading

14  treatise on class actions: "Inherent in the basic theory of class actions is the fact

15  that the court and the parties recognize ... [that] [i]f the liability to the class is

16  proved, then class recovery entitlement is measured by individual or aggregate

17  proofs of loss or of the defendant's unjust enrichment."  3 Newberg on Class

18  Actions, § 10.05; *see also In re: Chevron U.S.A., Inc.*, 109 F.3d. 1016, 1019-20 (5th

19  Cir. 1997)("The essence of the science of inferential statistics that one may

20  confidently draw inferences about the whole from a representative sample of the

21  whole"); *Segar v. Smith,* 738 F.2d 1249, 1264 (D.C.Cir. 1984)(court calculated

22  back and front pay in Title VII case on a class-wide basis using statistical

23  methods).

24      Plaintiffs' anticipated presentation of damages (based on a statistical,

25  formulaic analysis of the various factors set forth above), is particularly

26  manageable in the context of the common remedies being sought (*i.e*, refunds,

27  etc.).  The straightforward damages, and evidence regarding the same, which will

28  be presented by Plaintiffs during the damages phase of the trial, are markedly less

1    complicated than many other class actions which have been deemed manageable.

2    *See Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996)(upholding aggregate

3    damage award predicated on claims arising from the detention and torture of

4    thousands of citizens, including award of compensatory and exemplary damages);

5    *Dellums v. Powell*, 566 F.2d 167, 189 (D.C.Cir. 1977)(upholding a jury's award of

6    a lump sum of compensatory damages, and a distribution matrix of damages for

7    unlawful arrests and illegal detentions based on the arrests). Thus, Plaintiffs do not

8    anticipate that the damages phase of the trial would be particularly complex and

9    reasonably believe that the damages phase can be tried in approximately two (2) to

10   three (3) days.[16] In sum, Plaintiffs reasonably estimate that this case can be tried

11   fairly and efficiently in seven (7) to ten (10) days. Plaintiffs look forward to

12   commencing trial of this action on October 6, 2008, at 7:30 a.m.

13   **V.    CONCLUSION**

14          For the reasons stated above, Plaintiffs respectfully request that the Court

15   grant their Motion for Class Certification.

16                              KEMNITZER, ANDERSON, BARRON,
17                              OGILVIE & BREWER, LLP

18
     Dated: January 31, 2008       By: /s/   Mark F. Anderson
19                                       Mark F. Anderson (SBN 44787)
                                         445 Bush Street, 6th Floor
20                                       San Francisco, CA 94108
                                         Telephone: (415) 861-2265
21                                       Facsimile: (415) 861-3151

22

23   _____

24          [16]It is established that "the allocation of the aggregate sum [of the judgment]
25   among class members is an internal class accounting question...." *Bell*, 9
     Cal.Rptr.3d at 581; 2 Conte & Newberg on Class Actions, § 4:26. Any damages
26   award by the trier of fact would be claimed by Class members through a Court
     approved process overseen either by a third party claims administrator or a special
27   master. *See Newberg on Class Actions* § 9.55.
28

**Of Counsel**:

James E. Miller
Karen M. Leser (SBN 231189)
SHEPHERD, FINKELMAN, MILLER
   & SHAH, LLC
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120

James C. Shah
Nathan C. Zipperian
SHEPHERD, FINKELMAN, MILLER
   & SHAH, LLC
35 East State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883

**Attorneys for Plaintiffs**

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

3

4

    I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action. My business address is 445 Bush Street, 6th Floor, San Francisco, CA 94108.

5

    On January 31, 2008, I served the following document(s) described as

6

7

**PLAINTIFFS' NOTICE OF MOTION, MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MOTION**

8

9

on all interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

10

11

12

    Roy M. Brisbois, Esq.
    Jon P. Kardassakis, Esq.
    LEWIS BRISBOIS BISGAARD & SMITH, LLP
    221 North Figueroa Street, Suite 1200
    Los Angeles, CA 90012
    Telephone: 213-250-1800
    **Attorneys for Defendant**

13

14

X    (BY MAIL, 1013a, 2015.5 C.C.P.)

15

    I deposited such envelope in the mail at San Francisco, California. The envelope was mailed with postage thereon fully prepaid.

16

17

18

19

    I am readily familiar with the firm's practice for collection and processing of correspondence for mailing. Under that practice, this document will be deposited with the U.S. Postal Service on this date with postage thereon fully prepaid at San Francisco, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

20

21

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

22

    Executed on January 31, 2008, at San Francisco, California.

23

24

    /s/ Mark F. Anderson
    Mark F. Anderson

25

26

27

28