1  KEMNITZER, ANDERSON, BARRON, OGILVIE & BREWER, LLP
   Mark F. Anderson (SBN 44787)
2  445 Bush Street, 6th Floor
   San Francisco, CA 94108
3  Telephone: (415) 861-2265
   Facsimile: (415) 861-3151
4
   (Additional counsel appear on signature page)
5
   **Attorneys for Plaintiffs**
6
          IN THE UNITED STATES DISTRICT COURT
7         FOR THE NORTHERN DISTRICT OF CALIFORNIA

8  KEVIN MORRIS, GLENN R.          :
   SEMOW and CHAD J. COOK,         :    CIVIL ACTION NO. 02827 (WHA)
9  On Behalf of Themselves and     :
   All Others Similarly Situated,  :    CLASS ACTION
10                                 :
                      Plaintiffs,  :    DECLARATION OF MARK F.
11                                 :    ANDERSON IN SUPPORT OF
                                   :    PLAINTIFFS' MOTION FOR
12                                 :    CLASS CERTIFICATION
                                   :
13            vs.                  :
                                   :
14 BMW OF NORTH AMERICA, LLC :      Hearing:  March 6, 2008
                                   :   Time:    8:00 a.m.
15                    Defendant.   :   Judge:   Hon. William A. Alsup
                                   :   Courtroom: 9
16

17 I, Mark F. Anderson, declare as follows:

18       1.    I am an attorney with Kemnitzer, Anderson, Barron, Ogilvie, Brewer,

19 LLP, and my firm is co-counsel for Plaintiffs, Kevin Morris, Glenn R. Semow and

20 Chad J. Cook, in this action.  I have personal knowledge of each of the facts stated

21 herein, and if called could and would testify thereto.  I make this Declaration in

22 support of Plaintiffs' Motion for Class Certification.

23       2.    A true and correct copy of documents bates stamped MOR 01187 is

24 attached as Exhibit "1" to this Declaration.

25       3.    A true and correct copy of documents bates stamped MOR 01227-

26 01229 is attached as Exhibit "2" to this Declaration.

27

28 *Kevin Morris, et al. v. BMW of North America, LLC*    DECLARATION OF MARK F. ANDERSON IN
                                                          SUPPORT OF PLAINTIFFS' MOTION FOR
                                                          CLASS CERTIFICATION

1    4.    A true and correct copy of documents bates stamped MOR 06160-

2    06162 is attached as Exhibit "3" to this Declaration.

3    5.    A true and correct copy of documents bates stamped MOR 01237-

4    01238 is attached as Exhibit "4" to this Declaration.

5    6.    A true and correct copy of documents bates stamped MOR 01052

6    is attached as Exhibit "5" to this Declaration.

7    7.    A true and correct copy of documents bates stamped MOR 01040 is

8    attached as Exhibit "6" to this Declaration.

9    8.    A true and correct copy of documents bates stamped MOR 00753 is

10    attached as Exhibit "7" to this Declaration.

11    9.    A true and correct copy of a document bates stamped MOR 01336-

12    01338 is attached as Exhibit "8" to this Declaration.

13    10.    A true and correct copy of documents bates stamped MOR 01041 is

14    attached as Exhibit "9" to this Declaration.

15    11.    A true and correct copy of the firm resumes of Shepherd, Finkleman,

16    Miller & Shah, LLC and Kemnitzer, Anderson, Barron, Ogilvie & Brewer, LLP is

17    attached as Exhibit "10" to this Declaration.

18    12.    A true and correct copy of the cited pages of the deposition transcript

19    of Frank Gallacher is attached as Exhibit "11" to this Declaration.

20    I declare under penalty of perjury under the laws of the State of California

21    that the foregoing is true and correct and that this declaration was executed on

22    January 31, 2008, in San Francisco, California.

23

24

25    /s/    Mark F. Anderson
      Mark F. Anderson

26

27

28    *Kevin Morris, et al. v. BMW of North America, LLC*    DECLARATION OF MARK F. ANDERSON IN
      SUPPORT OF PLAINTIFFS' MOTION FOR
      CLASS CERTIFICATION

# EXHIBIT 1

Page 1 of 1

**REDACTED**

---

From:     Baker Bruce, V4-US-A-23
Sent:     Tuesday, May 16, 2006 3:33 PM
To:       Kiehne Michael, V4-US-A-2
Subject:  Top Tech Issues: ZU-A team Meeting

Michael,

As requested, here is a short list of the top problems:

**REDACTED**

> E90 Tire Wear & Noise (Bridgestone Turanza)
        - Numerous complaints of uneven tire wear & noise beginning as low as 7000 miles.

**REDACTED**

Regards,
Bruce

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01187

# EXHIBIT 2

**Report M additions**

**Report no.**
5129586

**Subject**
Excessive Tire Noise

**Status date (mm/dd/yy)**
1/18/06

**Status**
Recommendation approved

**Organization**
US, CAR

**Date created (mm/dd/yy)**
1/11/06

**Created by**
Michael Sorce

**PQM Problem reference**

**Urgency**
Reply requested

**Customer rating**
[ 6 ] - Vehicle is barely satisfactory, irritating problems are apparent to
the customer

**Reminder (mm/dd/yy)**

---

**Case**

**Number**
27

**QCI**

**Number**
2

**VIN**

**Number**

**Measure**

**Number**

**E series**
E90 (25) E91 (2)

**E series**
E90 (2)

**E series**

**E series**

**Production from
(mm/dd/yy)**
3/1/05

**Production up to (mm/dd/yy)**
4/22/06

---

**Fault**

**Fault location**

Chassis, Wheels, Tires

**Nature of fault**

Noise

**Condition**

Driving operation,
Driving/stationary, While driving

---

**Defect**

**Main group**
36  Wheels and Tyres

**Subgroup**
12  Tires

**Location**
08  Tires - Bridgestone

**Defect code**

**Defect description**

**Module**
31.20

**Area**
Chassis and suspension

**Fault code**

---

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01227

**Report AG**

Report no.                          Subject
_____

**Summary of customer complaints (customers' own words)**
Excessive tire noise while driving
_____

**Summary of workshop fault descriptions and presumed causes**
Road tested vehicle and verified complaint. Found excessive tire wear on the inner and outer section of
all four tires. The wear is more excessive on the front tires. Wheel alignment is within spec. All
information is listed below in the work performed section.
_____

**Summary of work performed**
Bridgestone Potenza
Front tires 225/45 R17 91V
Rear tires 255/40 R17 94V
Tread depths, tire pressures and DOT numbers:
Inner Middle Outer (In millimeters) Tire Pressure DOT Numbers
RF 6 8 4 29 EJH8DJM1905
LF 5 8 4 29 EJH8DJM1905
RR 4 7 3 32 EJUYDJM2505
LR 3 7 4 32 EJUYDJM2505
_____

**Summary of recommendations**
Check tire pressures, check alignment readings, document all cases via PuMA including all tire
information , DOT numbers and tread depth measurements.
_____

**Previous recommendations/queries/additional information**

Additional information  1/18/06  8:26 AM EST  Michael Sorce
Jeremie,

Good Afternoon. I will submit a different report for every brand, size and model tire as I receive PuMA
cases for each tire. The production ranges so far seem to be from 4/05 to 6/05 and that is for all the
different brand, size and model tires that are available for the E90.


Mike

,
Recommendation  1/18/06  4:00 AM EST  Jeremie Kraemer
Hello Mike,
please create one report for each brand (with sizes, DOTs and chassis settings). As long as we don't
exactly know if the problem is brand specific or not, it's better to separate the issues.
Are the reported cars within a limited production period?
Regards. Jeremie
,
Additional information  1/17/06  10:37 AM EST  Michael Sorce
Jeremie,

We have not contacted Bridgestone because the tire wear that is exhibited on these tires is the same as
all available tires for the E90. It is not good idea to contact Bridgestone about the issue because of the

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01228

same wear that is present on the other available tires. Because the wear is consistent with all the available tries regardless of size and brand would you like me to attach all the cases to one report?

Regards,
Mike

Query  1/16/06  3:13 AM EST  Jeremie Kraemer
Hello Mike,

have you already involved Bridgestone?
Have you any written statement or results of analysis from Bridgestone?
Regards. Jeremie

Additional information  1/12/06  9:06 AM EST  Michael Sorce
Jeremie,

I have attached pictures of the tires and current alignment readings to this report for review. I would describe the wear as heel and toe wear on the inner and outer tread block area. I have verified the tire pressures on two of the vehicle and the tire pressures on the third vehicle have been reported by the technician at the center which all check out OK. If parts are needed I will request them from the dealer. If you need anymore information please let me know.

Regards,
Mike

Additional information  1/12/06  3:37 AM EST  Jeremie Kraemer
Hello Mike,

please send representative pictures of the excessive wear.
Does the thread wear show the typicall shape of heal and toe?
Please also attach the chassis settings reports to your PuMA report.
Can you testify that the tire pressure was OK?

Have you any defective part that could be, if necessary, requested for analysis?

Regards.
Jeremie


New   Additional information

---

© 2002-2007 BMW OF NORTH AMERICA, LLC. ALL RIGHTS RESERVED.

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01229

# EXHIBIT 3

Jove Marianela, (T)

| From: | Gallacher Frank, V4-US-A-22 |
|---|---|
| Sent: | Tuesday, February 27, 2007 12:10 PM |
| To: | Ludwig Robert, V4-US-A-41; Calamon Jim, V4-US-V-26 |
| Cc: | Goyert James, V4-US-V-26; Mulhern William, V4-US-A-41; Lucas Russ, V4-US-V-2-A; Demski Larry, V4-US-A-4; Kiehne Michael, V4-US-A-2; Olczak Vlodek, V4-US-A-22 |
| Subject: | RE: Bridgestone tires SIB 36 06 06 |

**Importance: High**

| Tracking: | Recipient | Read |
|---|---|---|
| | Ludwig Robert, V4-US-A-41 | Read: 2/27/2007 11:33 PM |
| | Calamon Jim, V4-US-V-26 | Deleted: 2/28/2007 6:25 AM |
| | Goyert James, V4-US-V-26 | Read: 3/2/2007 8:12 AM |
| | Mulhern William, V4-US-A-41 | |
| | Lucas Russ, V4-US-V-2-A | Read: 2/27/2007 3:47 PM |
| | Demski Larry, V4-US-A-4 | Read: 2/27/2007 12:24 PM |
| | Kiehne Michael, V4-US-A-2 | Read: 2/27/2007 12:34 PM |
| | Olczak Vlodek, V4-US-A-22 | Read: 2/27/2007 12:47 PM |

Gentlemen,

The bulletin SI B36 06 06 represents an analysis specifically related to the Bridgestone Turanza EL42 tires fitted on the E90/91 vehicles. This analysis included PuMA Cases, Field Reports, and on-site diagnosis of vehicles fitted with the aforementioned tires. Technically speaking, although the Potenza tire is produced by Bridgestone, the tire is different in construction from the Turanza and must be handled as a separate issue. I will pursue this issue and work on an appropriate resolution. As we are in the information gathering step of the process, I must ask that we continue to stress the importance of PuMA Cases and Field Reports related to this topic. These cases and reports continue to play a key role in our problem resolution process and help us advance market related concerns with BMW AG.

Thank You and Best Regards,
Frank Gallacher

---

**From:** Ludwig Robert, V4-US-A-41
**Sent:** Sunday, February 25, 2007 10:27 PM
**To:** Calamon Jim, V4-US-V-26
**Cc:** Goyert James, V4-US-V-26; Gallacher Frank, V4-US-A-22; Mulhern William, V4-US-A-41; Lucas Russ, V4-US-V-2-A; Demski Larry, V4-US-A-4; Kiehne Michael, V4-US-A-2
**Subject:** Bridgestone tires SIB 36 06 06

We are not currently at liberty to add tires to the SI as this is an AG approved bulletin. The SI was designed to cover a particular model tire situation that is not shared with other designs.
We will be having a tire meeting on 3-8 and will bring your issue up for discussion.

Unfortunately, we most likely will need to live with the tires and solutions that are currently available. We will keep you informed of any developments.
Thank you for the input.
Bob Ludwig

---

**From:** Calamon Jim, V4-US-V-26

1/18/2008

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 06160

Page 2 of 3

**Sent:** Sunday, February 25, 2007 9:45 AM
**To:** Ludwig Robert, V4-US-A-41; Lucas Russ, V4-US-A-2-A
**Cc:** Goyert James, V4-US-V-26; Gallacher Frank, V4-US-A-22; Mulhern William, V4-US-A-41
**Subject:** RE: Bridgestone tires SIB 36 06 06

Bob, that is understood and it appears that the centers may have placed claims in error for the Potenza tires, but that does not answer the question of why we don't cover the Potenza tire when it also appears to have the same problem. The scope of this problem is very large and telling the customer it is not covered under the SI is not the answer either. We need to add the Potenza tires to the SI and take care of the customer and centers, otherwise we will have to write goodwill claims for all of these tires and add to the unreal workload,

*J. R. Calamon*

V4-US-V-26
Aftersales Market Manager 26
BMW of North America, LLC
 210-862-9903

**From:** Ludwig Robert, V4-US-A-41
**Sent:** Friday, February 23, 2007 1:46 PM
**To:** Lucas Russ, V4-US-V-2-A
**Cc:** Goyert James, V4-US-V-26; Calamon Jim, V4-US-V-26; Gallacher Frank, V4-US-A-22; Mulhern William, V4-US-A-41
**Subject:** Bridgestone tires SIB 36 06 06

The scope of SI B36 06 06 was always limited to one model tire in 2 different sizes. The technical issues are not universal and applying the SI to other situations is inappropriate.

Perhaps a discussion with the service manager on the details of this SI is needed.

To assist while Bill Greehey is out, the other contacts in the Southern group include:

Please feel free to contact:     Bill Mulhern        201-307-3721
                                 Jim Richardella     201-307-3737
                                 Craig Salerno       201-307-3718
                                 Chuck Winik         201-594-3319
                                 Chris Mancini       201-307-3721

Thank you.
Bob Ludwig

**From:** Lucas Russ, V4-US-V-2-A
**Sent:** Friday, February 23, 2007 10:42 AM
**To:** Ludwig Robert, V4-US-A-41; Mulhern William, V4-US-A-41
**Subject:** FW: Bridgestone tires SIB 36 06 06
True?

**From:** Calamon Jim, V4-US-V-26
**Sent:** Thursday, February 15, 2007 7:00 AM
**To:** Lucas Russ, V4-US-V-2-A
**Cc:** Goyert James, V4-US-V-26
**Subject:** Bridgestone tires SIB 36 06 06

Just thought I'd give you a heads up, I'm having calls from several centers complaining about their tire warranty

1/18/2008

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 06161

claim not being paid and I think I have found the problem. In reviewing the SI on the tire noise problem the SI only covers the Bridgestone Turanza and not the Potenza and many of the claims are for the Potenza. The claim are being rejected and center keep trying different defect code, but the claims won't go through and with Mr. Greehey being out due to illness the claims reviewers are very slow in returning call due to their high work load. Most centers have not caught on yet and they assume that the SI would cover both as they both have the noise complaint. I can see this really becoming a problem and lots of GW being done to cover Potenza tire claims.

*J. R. Calamon*

1/18/2008

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 06162

# EXHIBIT 4

# REDACTED

| | |
|---|---|
| From: | Harris Alan, V4-US-A |
| Sent: | Friday, April 20, 2007 7:24 AM |
| To: | Marks Greg, V4-US-A-1; Kiehne Michael, V4-US-A-2 |
| Subject: | Fw: Run Flat Tires - V-Circle April 16th |

Guys

Can I please ask you to get this one done today, we must have all the relevant information.

Alan
--------------------------
Alan Harris
Vice President Aftersales
BMW of North America

Sent via Handheld

-----Original Message-----
From: Brekus Richard, V4-US-B-1
To: Detsch Anton, V4-1; Harb Jacob, V4-US-B-1
CC: Harris Alan, V4-US-A; Dedekind Michael, V4-1
Sent: Fri Apr 20 06:56:13 2007
Subject: Re: Run Flat Tires - V-Circle April 16th

Anton

I had asked Alan Harris for a summary from his viewpoint, and reminded him yesterday that we need it soon.

I expect we will get it today, if not Jacob can you follow up early next week with Greg Marks.

Rich


Rich Brekus
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Detsch Anton, V4-1
To: Brekus Richard, V4-US-B-1; Harb Jacob, V4-US-B-1
CC: Harris Alan, V4-US-A; Dedekind Michael, V4-1
Sent: Fri Apr 20 03:36:15 2007
Subject: FW: Run Flat Tires - V-Circle April 16th

Hi Rich, Hi Jacob,

In yesterday's VPK also the Run Flat Tire issue was shortly discussed (under Miscellaneous). It will be further discussed in next APW. To prepare the APW paper, we are asked to provide VZ-42 with information on all "problems" with run flat tires (in addition to the supply situation).
Enclosed please find the information we already got from V4-CA. I assume the problems in the U.S. will be the same more or less.

Please let us know as soon as possible (preferable by beginning of next week) if there are other specific issues with run flat tires in the U.S.

Thanks and regards, Anton

1

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01237

BMW Group
Anton Detsch
80788 München
Tel: +49-89-382-23606
mailto: Anton.Detsch@bmw.de
Url: http://www.bmwgroup.com/
--------------------------------------------------------------
Bayerische Motoren Werke Aktiengesellschaft
Vorstand: Norbert Reithofer, Vorsitzender, Frank-Peter Arndt, Ernst Baumann, Klaus
Draeger, Michael Ganal, Stefan Krause Vorsitzender des Aufsichtsrats: Joachim Milberg Sitz
und Registergericht: München HRB 42243
--------------------------------------------------------------


Von: Shaver Adam, V4-CA-B
Gesendet: Donnerstag, 12. April 2007 22:28
An: Detsch Anton, V4-1
Cc: Schmitz Georg, V4-1; Duffield Lindsay, V4-CA; Dedekind Michael, V4-1; Cardinale John,
V4-CA-A-2; Marcotte Kevin, V4-CA-K
Betreff: Run Flat Tires - V-Circle April 16th


Hello Anton,


There have been plenty of issues surrounding the growing use of run-flat tires. The
following list outlines the known and well-document issues in CA:


§       Ride quality – depending on the model, the ride can be quite uncomfortable.
Recent models have certainly shown improvement in this area (E9x, E70) as suspensions are
now being developed specifically for the use of run-flat tires, however ride quality is
still not on par with non run-flats.


§       Premature wear & reparability – we are replacing tires as early as 10,000 –
12,000 km's for feathering and excessive tread wear. Tires often seem to be obsolete
within 30,000 Kms. Customers expect at least twice that range. Furthermore, customers do
not like the fact that BMW AG does not recommend repairing punctured run flats, while some
tire manufacturers allow it (under certain conditions).


§       High replacement costs – run-flat tires have received negative press regarding
their high replacement costs, and combined with the previous point the issue of cost
certainly contributes to customer frustration/dissatisfaction.


§       Road noise – with feathering comes excessive road noise. The howling that
results from the feathering resembles that of worn wheel bearings.


§       Supply – we are having difficulty with lack of inventory of both 16 and 17 inch
tires. E70 replacement tires are non-existent in North America at the moment, with
customers waiting in excess of 1 week to replace a flat tire (flown in from AG).

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01238

# EXHIBIT 5

# New 3 Series Frequently Asked Questions

## Run-Flat Tires: (Steve Mitchell)

**Will run-flat tread life be as long as conventional tires?**
- Yes. The tread compound is the same as non-run-flats and your customers can expect a tire life that is similar.

**Can you mount a conventional tire on a new 3 Series rim?**
- Yes, it can be done if the customer wishes so; but, BMW does not recommend it. BMW always recommend mounting only approved tires (see KSD for list of approved wheel & tires combination). For vehicles equipped with run-flat tires, there is no spare tire to use in case of a flat or blow-out. Therefore, please use the run-flats on these new 3 Series vehicles.

**We used to "sell" the idea that the spare tire helped absorb rear crash energy. Is the new 3 Series' rear now less crash resistant?**
- Not at all. Structural stiffness enhancements have made the rear of the vehicle even stronger than the previous generation vehicle with spare tire.

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01052

# EXHIBIT 6

Page 2 of 2

Volker Hader
Telefon: 89-382-12076
mailto: Volker.Hader@bmw.de
Url: http://www.bmwgroup.com
-------------------------------------------

**Von:** Gallacher Frank, V4-US-A-20
**Gesendet:** Donnerstag, 13. Juli 2006 05:47
**An:** Hader Volker, VS-23
**Betreff:** More E90 Bridgestone

Volker,

Regarding the noise complaints on the Bridgestone Turanza tires.

The costs of replacement for the tires under the guidelines of the proposed bulletin are as follows:

Replacement of (4) 205/55R16 Turanza tires = $776 US
Replacement of (4) 225/45R17 Turanza tires = $1020 US

I have attached a report on claims submitted on these tires from 5/1/06 to present. May and June claims look to be approximately 32 per month. The 16 inch tire for the 325 would appear to account for 33% of the claims. I took the time to review the PuMA Cases and Reports and attach any unlinked cases. You will find 63 Cases linked to the Report for the 16 inch tire and 111 Cases linked to the Report for the 17 inch tire. Perhaps we can talk on Thursday.

Thank You and Best Regards,
Frank

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 01040

# EXHIBIT 7

# BMW Group

**Inter-Branch Memo**

**To:** Alan E. Harris
**Dept:** Aftersales, V4-US-A

**From:** Barbara De Paul
**Dept:** Customer Relations and Services, V4-US-A-5

**Date:** July 21, 2006

**Re:** **Run-Flat Tires Internet Chatter**

Following are the comments/complaints found throughout the last months in the Internet Forums regarding Run-Flat Tires by platform:

E90

|   | Topic | Date | Forum | Page |
|---|-------|------|-------|------|
| 1 | "Class Action" mention due to tire noise | 5/18/06 | Edmunds.com | 2 |
| 2 | Noisy tires | 6/21/06 | Edmunds.com | 2 |
| 3 | Tires "cupping" | 6/14/06 | bimmerfest.com | 2 |
| 4 | Availability at BMW centers | 6/26/06 | Edmunds.com | 3 |
| 5 | BMW NA replaced tires due to wear and noise | 6/14/06 | Edmunds.com | 3 |
| 6 | Abnormal wear causing noise | 5/12/06 | bimmerfest.com | 4 |
| 7 | Noisy tires | 7/8/2006 | Edmunds.com | 4 |
| 8 | Availability issue | 6/21/2006 | e90post.com | 4 |

This platform has the highest volume of messages. Only the most representative messages are included in this summary. However, more examples are included in the attachment. The majority of the messages belong to a thread from Edmunds.com entitled "BMW 3-Series: Run Flat Tires" which has 296 messages as of 07/20/06.

E85

|   | Topic | Date | Forum | Page |
|---|-------|------|-------|------|
| 1 | Poor ride, noise, premature wear, expensive | 4/21/2006 | Roadfly.com | 5 |
| 2 | Availability (tires in backorder) | 4/22/2006 | z4um.com | 5 |
| 3 | Tires became very noisy and the ride got rougher (customer talking about OEM tires) | 1/18/2006 | Roadfly.com | 5 |

Very few comments are found regarding Z4 run-flat tires on the Internet forums that pertain to US customers. The most common Z4 forum is an international. The examples included in this summary are only US customers.

E60

|   | Topic | Date | Forum | Page |
|---|-------|------|-------|------|
| 1 | Noisy tires (replaced for the second time) | 6/20/2006 | bimmerfest.com | 6 |
| 2 | Noisy tires | 6/26/2006 | bimmerfest.com | 6 |
| 3 | Noisy tires replaced by BMW NA | 1/30/06 | forums.e60.net | 7 |

The E60 noise and wear issue started last year, but current posts can still be found.


Printed on Recycled Paper

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL
MOR 00753

# EXHIBIT 8

 SI B 36 06 06
Wheels and Tires

January 2007
Technical Service

---

**SUBJECT**
**Noise Caused by Irregular Tire Wear**

**MODEL**
E90, E91 (3 Series) equipped with Bridgestone Turanza EL42 RFT Run Flat Tires

**SITUATION**
An abnormal or loud noise caused by irregular tire wear on some Bridgestone Turanza EL42 RFT Run Flat tires may be objectionable to some customers. The noise is totally different from normal road noise.

**CORRECTION**
**If this situation is detected based upon a customer complaint and only if the tires have less than 20,000 miles,** follow the recommendations listed under Procedure.

**PROCEDURE**



Abnormal noise may be caused by the irregular tire wear referenced in this Service Information. The wear occurs at the tire's inner and outer shoulders as indicated by the arrows in the illustration.
Tires, which exhibit this type of wear, will have feathered or scalloped edges of the tread blocks at the tire's inner and outer shoulder areas.



This type of wear is referred to as heel and toe wear. Heel and toe wear is simply a difference in height between the leading and trailing edges of the individual tread blocks as shown in the illustration. While this condition is not uncommon, a difference in tread block height of more than 0.6mm can create an abnormal noise.

This type of wear can be noted when inspecting the shoulder areas visually or by hand.

**Always wear leather gloves when handling/inspecting tires.**

The tread blocks will feel smooth in one direction and rough in the opposing direction.

Due to the differences in wear patterns which usually occur at the front and rear axle tires, this type of irregular wear is generally limited to the tires fitted on the front axle. But, if the rear tires are also

MOR 01336

causing abnormal noise and exhibit this type of wear, then all 4 tires should be replaced.

Heel and toe wear can be accelerated by low tire pressure and vehicle overloading. Therefore, customers should be reminded to check tire pressures at appropriate intervals. BMW recommends checking tire pressures at least twice a month and before long trips.

WARRANTY INFORMATION
Tires are warranted by their manufacturer and not by BMW of North America. This type of irregular wear is not covered by the normal tire warranty. Claims that arise from this Service Information may be submitted by participating centers using the BMW Tire Center Target Satisfaction Program. For more information regarding the BMW Tire Center Target Satisfaction Program, please refer to Service Information B01 02 04.

- **Use DCSnet claim entry selecting "NO" next to Tire Program on the Repair Order Line Item Details screen. Claim rejection will result if this instruction is not followed.**

REIMBURSEMENT
Reimbursement for claims under this Service Information will be processed in accordance with the terms and conditions of the BMW Tire Center Target Satisfaction Program, with the exceptions noted in this SI. Only centers enrolled in the BMW Tire Center Target Satisfaction Program will be permitted to submit claims for reimbursement.

All claims submitted in conjunction with this SI will be paid at the following rates:

- **100% part and labor reimbursement as noted below, up to 10,000 miles on the tire.**

- **50% part and 100% labor reimbursement, from 10,001 to 20,000 miles on the tire.**

| Defect Code | 36 12 93 57 00 | |
|---|---|---|
| Labor Reimbursement | $20 per tire | Sublet code: 4 |
| Disposal Allowance | $5 per tire | Sublet Code: 4 |
| Tires | Dealer Net cost | (see percent based on mileage stated above) |

NOTES
Please note that the following conditions apply to all claims related to this Service Information:

- Only tires that exhibit the specific wear outlined in this Service Information are eligible for coverage.

- Bridgestone tires, when available, will be used for replacement.

| Part Number | Description |
|---|---|
| 36 12 0 403 092 | Bridgestone Turanza EL42 RFT 205/55R16 |
| 36 12 0 403 093 | Bridgestone Turanza EL42 RFT 225/45R17 |

- If the specified Bridgestone tires are not available, please contact The BMW Tire Center for other

BMW approved tires that can be used as substitutes.

- The Dealer Net cost is established based on the applicable BMW part numbers.

- Tires which have been in use for more than 20,000 miles are not eligible for coverage under this Service Information.

- Tires that have been plugged, patched, or otherwise repaired are not eligible for coverage.

- Tires will not be requested for return unless otherwise noted. They should be rendered useless and properly discarded/recycled.

- Tires that do not meet all criteria listed in this Service Information will result in a debit of the entire claim.

[ Copyright © 2007 BMW of North America, LLC ]

MOR 01338

# EXHIBIT 9

Page 1 of 1

**From:** Gallacher Frank, V4-US-A-20
**Sent:** Monday, June 19, 2006 4:18 PM
**To:** Hader Volker, VS-23
**Cc:** Olczak Vlodek, V4-US-A-22
**Subject:** Bridgestone Meeting

**Attachments:** BMW NA Recommendations for Bridgestone Negotiation.doc; B360205 07 06 2005.doc

Volker,

I have put together some of the major points for discussion with Bridgestone. In many ways, we would like to mirror the agreement that was reached with Dunlop. The exception would be the mileage limitations. Since the Dunlop was a Summer/Sport tire we agreed on 20,000 miles. With the case of the Bridgestone Turnaza, we should ask for a mileage limit of 30,000 miles. I know we discussed coverage to 25,000 miles, but, I think we should start with 30,000 miles and then we can negotiate. We would expect a longer life from these all season tires. Please review the attachments and let me know if there is anything you would like to discuss before the meeting.

Thanks You and Best Regards,
Frank Gallacher

file://D:\Bridgestone Meeting.htm

8/27/2007

SUBJECT TO PROTECTIVE ORDER: CONFIDENTIAL

# EXHIBIT 10

## SHEPHERD, FINKELMAN, MILLER & SHAH, LLC

*www.sfmslaw.com*

———————— ▪ ————————

CONNECTICUT

FLORIDA

NEW JERSEY

PENNSYLVANIA

WISCONSIN

## SUMMARY OF FIRM QUALIFICATIONS

The Law Firm of Shepherd, Finkelman, Miller & Shah, LLC ("SFMS" or "Firm") concentrates its practice in the areas of complex commercial litigation with a particular emphasis on consumer protection, securities and investment fraud, antitrust, contract, healthcare fraud, ERISA and employment class actions, as well as False Claim Act litigation. The Firm represents the State of Connecticut, privately held corporations, healthcare providers, institutional investors, including pension, health and welfare funds, and private individuals in complex litigation and related matters throughout the United States. The vast majority of the Firm's cases are handled on a contingent fee basis.

As reflected in the accompanying biographical histories, the lawyers at SFMS are accomplished and diverse with years of experience in complex commercial litigation. The Firm's attorneys all are alumni of larger law firms who have chosen the flexible, informal and cooperative atmosphere of a smaller firm while continuing to pursue a sophisticated and challenging practice nationally and, at times, internationally, on behalf of the Firm's clients. In light of the nature of the Firm's practice and in recognition of the skill, professionalism and hard work of the Firm's attorneys, SFMS and its attorneys have served as court-appointed lead counsel and class counsel in state and federal courts throughout the United States. In the cases in which SFMS has served as lead counsel, the Firm has been recognized for the quality of the representation it provides to its clients and for the excellent results that it has achieved.

65 MAIN STREET
CHESTER, CT 06412
860/526-1100
FAX 860/526-1120

1640 TOWN CENTER CIRCLE, SUITE 216
WESTON, FL 33326
954/943-9191
FAX 954/943-917335

475 WHITE HORSE PIKE
COLLINGSWOOD, NJ 08107
856/858-1770
FAX 856/858-7012

35 E. STATE STREET
MEDIA, PA 19063
610/891-9880
FAX 610/891-9883

111 E. WISCONSIN AVENUE, SUITE 1750
MILWAUKEE, WI 53202
414/226-9900
FAX 414/226-9905

### SFMS' PRIMARY AREAS OF PRACTICE

Although SFMS does not maintain formal departments, the Firm's attorneys generally devote their time and efforts to the following practice areas:

### Securities Fraud and Breaches of Fiduciary Duty

The Firm is actively involved in the litigation of individual and class action cases alleging securities fraud, breach of fiduciary duty, and shareholder derivative claims, on behalf of shareholders, health and welfare and pension funds, and professional investors. The Firm has played a substantial role in a number of these cases, including the following cases: *In re aai Pharma Derivative* Litigation (U.S.D.C., E.D.N.C.); *In re Adelphia Securities Litigation* (U.S.D.C., E.D.PA.); *In re AFC Enterprises Securities Litigation* (U.S.D.C., N.D.GA.); *Reardon v. Ameripath, Inc.* (Cir.Ct., Palm Beach Cty., FL); *D'Andrea v. CIGNA Securities, Inc.* (Sup. Ct., Camden Cty., N.J.); *Simons v. EMCOR Group, Inc.* (U.S.D.C., D.Conn.); *Smith v. Interstate Bakeries Corp.* (U.S.D.C., W.D.Mo.); *Burnetti v. Maxxim Medical,* (Cir.Ct., Pinellas Cty., FL.); *In re McKesson HBOC, Inc. Securities Litigation* (U.S.D.C., N.D.CA.); *In re Mercator Software Derivative Litigation* (Conn.Super); *In re Star Gas Securities Litigation* (D.Conn.); *In re SupportSoft Derivative Litigation* (Calif. Super.). The Firm also is currently representing Kornitzer Capital Management, Inc., which has been appointed as the lead plaintiff in *In re Faro Technologies Securities Litigation* (M.D.Fla.), and the International Brotherhood of Teamsters in *In re Coca-Cola Enterprises Derivative Litigation* (Del. Ch.). In addition, SFMS regularly represents existing institutional and individual clients in significant proceedings before the National Association of Securities Dealers ("NASD")and the New York Stock Exchange ("NYSE") regarding securities fraud and unsuitable investments.

### Consumer Protection Claims

The Firm is actively involved in the prosecution of numerous consumer protection cases nationwide, in both state and federal courts. The Firm and its attorneys have had a leadership role representing consumers in many of these class action cases, including, for example: *Annelli v. Ford Motor Co.* (Conn. Super., New London, J.D.)(secret warranty class action on behalf of Crown Victoria, Grand Marquis and Lincoln Town Car owners and lessees); *Cuellar and McVicker v. Ford Motor Co.* (Milwaukee County Cir. Ct.)(secret warranty class action on behalf of Crown Victoria, Grand Marquis and Lincoln Town Car owners and lessees); *Shorewest Realtors, Inc. v. Journal Sentinel, Inc.* (Milwaukee County Cir. Ct., WI)(overstatement of circulation class action on behalf of newspaper advertisers); *LaRaia v. Rexall Sundown* (Cir. Ct., Palm Beach Cty., FL)(marketing and sale of dietary supplements); *Hurkes Harris Design Associates, Inc. v. Fujitsu Computer Products of America, Inc.* (Sup. Ct., Santa Clara Cty., CA)(computer hard drives); *Cress v. Independence Blue Cross* (U.S.D.C., E.D. PA) (health plan subscribers recover 99% of their losses); *Doh v. Sears, Roebuck & Co.* (Cir. Ct., Cook Cty., IL)(carpet cleaning service); *Stoddard v. Advanta National Bank* (Sup. Ct., New Castle Cty., DE)(credit card interest rates); *In re American Family Publishers Business Practices Litigation* (U.S.D.C., D. N.J.) (sweepstakes fraud); *Ferguson v. Columbia/HCA* (Cir. Ct., Washington Cty.,

TN) (hospital charges); *In re:Providian Financial Corp. Credit Card Terms Litigation* (U.S.D.C., E.D. PA) (credit card practices); *Chavers v. Fleet, (RI) N.A.* (Sup. Ct., R.I.) (credit card practices); *Perod v. McKenzie Check Advance* (U.S.D.C., E.D. PA)(payday loans); *Morris v. Odimo.com* (Cir. Ct., Broward Cty., FL)(grey market watch sales); *Fanelli v. Wal-Mart Stores, Inc.* (Sup. Ct., Gloucester Cty., N.J.)(grey market watch sales); *Vega v. B.J.'s Wholesale Club, Inc.*, (C.C.P. Phila., PA)(grey market watch sales); *Troilo v. Oriental Trading Company*, (Dist. Ct., Douglas Cty, NE)(catalog company charges). The Firm also currently represents the State of Connecticut in four separate lawsuits pending in the Superior Court of Connecticut against pharmaceutical companies arising under the Connecticut Unfair Trade Practices Act ("CUTPA") alleging the manipulation of the average wholesale price ("AWP") of certain prescription drugs.

### Employee and Civil Rights

The Firm also specializes in employment and labor litigation on behalf of individuals and employers. Firm attorneys have worked on a diverse variety of employment cases, including cases involving race, gender and age discrimination, ERISA, breach of contract claims, and wage/hour claims. The Firm and its attorneys were Co-Lead Counsel in *Marks v. ACCU Personnel, Inc. et al.* (Sup. Ct., Camden Cty., N.J.), a successful employment discrimination action against a large temporary placement agency which was alleged to place minority employees in lower paying positions than Caucasian employees. The Firm was Lead Counsel in *Russell v. Howell* (U.S.D.C., E.D. TN), achieving a multi-million dollar ERISA recovery for class members where the price of their ESOP stock was alleged to have been driven down improperly by company management, and is Co-Lead Counsel in *Levine v. United Healthcare Corporation* (U.S.D.C., D.N.J.), in which insurance companies are alleged to have violated ERISA duties in the collection of subrogation liens.

The Firm represents a number of highly-compensated individuals in defamation and employment-based claims in proceedings before the NASD, NYSE and in state and federal courts throughout the United States. In these proceedings, attorneys in the Firm have recovered many millions of dollars for its clients. Finally, the Firm serves as national labor counsel for several select employers.

### False Claims

The Firm currently is handling a number of *qui tam* actions under the United States False Claims Act, particularly in health care related areas. Many of these cases, including several very large prosecutions, are "under seal" and therefore cannot be disclosed. Recent successfully concluded False Claims Act cases include *U.S. ex rel. Hutcherson v. Medshares, Inc.* (U.S.D.C., E.D.VA) (multi-million dollar settlement for over charges to Medicare against home healthcare provider); *U.S. ex rel. Brouder v. Polaroid Corp.* (U.S.D.C., D. Mass.) (multi-million dollar settlement for overcharges to federal government in sale of film); and *U.S. ex rel. Brookhart v. Integrated Health Services, Inc.* (U.S.D.C., S.D. Iowa) (overcharges to Medicare in the sale and leasing of durable medical equipment).

-2-

### Antitrust

We have addressed substantive antitrust and unfair trade issues relating to, among others, horizontal price agreements, market allocations, concerted refusals to deal, purchasing and selling arrangements, monopolization, covenants not to compete, price-fixing and tying arrangements. Our attorneys have represented corporations and individuals in antitrust cases involving local and regional markets in the United States. The Firm's attorneys have particular experience representing businesses in actions alleging price discrimination under the Robinson-Patman Act, including successful trials to jury verdict.

The Firm has served in leadership and other roles in the litigation of a number of plaintiffs' class action antitrust cases, most recently including *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* (E.D.N.Y.)(monopolistic practices); *In re Dynamic Random Access Memory Antitrust Litigation* (N.D.Cal.)(price fixing); *Chicon v. Intel Corporation* (D.Del.)(monopolistic practices); *Vaughn v. 3M Company* (Cir. Ct., Palm Beach Cty., FL)(monopolistic practices in adhesive tape market); *Luppino v. Visa U.S.A., Inc.* (Cir. Ct., Palm Beach Cty., FL)(monopolistic practices in credit card market) and *In re Compact Disk Antitrust Litigation* (U.S.D.C., C.D. Ca.)(price fixing).

### Insurance Practices

The Firm currently is handling numerous actions against insurance companies concerning marketing practices, settlement and payment practices, and calculation of benefits. The Firm has a substantial role in a number of these cases, including the following cases: *Lerose v. Stewart Title, Inc.* (Cir. Ct., Jackson Cty., MO) (Lead Counsel) (title insurance charges); *Blass v. Fidelity National Title Insurance Company* (Sup. Ct. Gloucester Cty., N.J.) (Lead Counsel) (title insurance charges); *Penn v. Liberty Mutual Insurance Group, et al.*(Sup. Ct., Essex Cty., N.J.) (Lead Counsel) (automobile insurance loss adjustment practices); *In Re Nepomuceno and Related Cases v. Knights of Columbus* (U.S.D.C., N.D. IL) (vanishing premium insurance policies); *Rudin v. Monumental Life Insurance Co.*(Cir. Ct., Kenton Cty., KY) (failure to honor burial insurance policies); *Lane v. Chicago Title Corporation* (Cir. Ct., Cook Cty., IL) (title insurance charges).

### Corporate Contingent Fee Litigation

Increasingly, the Firm has been retained to handle litigation for corporate plaintiffs on a contingent fee basis. We have found that while corporate counsel tend to be reluctant to deviate from tried and true hourly billing procedures, and unaccustomed to working with a "plaintiff's firm," a contingent fee structure ensures the proper incentives and often works to further the corporation's interests. Although certain issues can arise in these commercial lawsuits that present difficulties in the calculation of a percentage-based attorneys' fee (*e.g.*, handling of counterclaims, the value of injunctive relief or licensing rights), we thus far always have been able to create satisfactory arrangements that are fair to everyone.

In one recent example of the contingent fee structure fitting a corporation's circumstances, the Firm was retained by a major consumer products company on a contingent fee basis to handle patent/trademark litigation against distributors and sellers of "knock off" products. This was an area in which the client historically had been content to obtain seizures of

products and injunctions, and was reluctant to initiate damages actions because of the expense and uncertain outcome. The Firm was able to obtain a sizeable recovery, collect revenue that the company otherwise would have foregone, and at the same time help solidify and even enhance the client's reputation for aggressively protecting its trademark and products.

## THE FIRM'S ATTORNEYS

In addition to our professional staff of paralegals, legal assistants and other support staff, as well as the contract attorneys, investigators, economists, accountants and other experts that SFMS regularly engages to assist it in representing the Firm's clients, the following attorneys currently practice with the Firm:

**Scott R. Shepherd** is admitted to practice law in the state courts of Pennsylvania, Illinois and Florida, as well as in the United States District Courts for the Eastern District of Pennsylvania, the Northern District of Illinois, and the Southern and Middle Districts of Florida, the United States Courts of Appeal for the Third, Fourth, Seventh and Eleventh Circuits, and the United States Supreme Court. In addition to these courts and jurisdictions, Scott has worked on cases with local counsel throughout the country. Scott earned his undergraduate degree *summa cum laude* from Westminster College in New Wilmington, Pennsylvania and his law degree from the University of Chicago Law School. Scott began his law practice in 1985 in Chicago, representing defendants in class action, securities and products liability litigation with one of the largest law firms in the country. Returning to Pennsylvania in 1989, Scott worked with a large Philadelphia corporate and defense law firm. After he "switched sides," he became a Partner at Greenfield & Rifkin LLP, a well known class action firm, before he started his own firm in 1998.

Scott's practice is concentrated on the prosecution of consumer class actions, False Claims Act cases and securities class actions. Scott is also experienced in handling antitrust, employment and other complex commercial matters. Among Scott's current (or very recent) cases, he serves as class counsel in a number of class actions pending throughout the country. For instance, he is presently co-lead counsel in cases in Florida state court alleging that Rexall Sundown's marketing of dietary supplements violated consumer fraud acts, and in which Judge Lewis in West Palm Beach recently approved a $16 million settlement. Scott recently served as lead counsel in *Cress et al. v. Independence Blue Cross*, in which Judge Rendell of the United States District Court for the Eastern District of Pennsylvania approved a multi-million dollar settlement which resulted in a recovery by health plan subscribers of over 99% of their out-of-pocket losses. Scott is also co-lead counsel in the Delaware Superior Court case of *Stoddard v. Advanta*, a consumer class action against one of the nation's largest credit card issuers, in which Judge Bifferato recently approved a settlement worth in excess of $10 million, including cash refunds to Advanta cardholders and a decrease in the interest rates on Advanta cards. Scott is also co-lead counsel with James E. Miller in *Hurkes Harris Design Associates, Inc. v. Fujitsu, Inc.*, in which the Superior Court of California recently approved a settlement of $42.5 million in damages.

Scott is also involved in many class actions in the health and life insurance industries. He has represented, and currently represents, policyholders in several cases alleging deceptive sales and marketing practices in connection with "vanishing premium" life insurance policies. He also recently represented a group of 50 retirees in an action against CIGNA Corp., alleging that the retirees were induced to invest lump sum retirement benefits in speculative inappropriate securities. Finally, Scott represents "whistleblowers" in cases brought under the United States

-4-

False Claims Act, particularly in the Home Healthcare and Durable Medical Equipment industries. Scott recently authored a widely published article on the Act's application in the context of Medicare and Medicaid fraud. Among his many False Claims Act cases, Scott is currently leading cases in Tennessee, Massachusetts, Virginia, Texas and Iowa.

In addition to his class action practice, Scott has also handled a number of significant *pro bono* matters. He has represented clients in a number of political rights cases, including political asylum and voting rights actions. He has also handled numerous criminal appeals, including death penalty cases. Scott is a member of the Association of Trial Lawyers of America, the American Health Lawyers Association, and the Palm Beach County, Florida and Delaware County, Pennsylvania Bar Associations. He divides his time between the Firm's Pennsylvania and Florida offices.

**Natalie Finkelman Bennett** is admitted to practice law in the state courts of Pennsylvania and New Jersey, as well as in the United States District Courts for the Eastern District of Pennsylvania and District of New Jersey, and in the United States Courts of Appeal for the Third and Ninth Circuit. In addition to these courts and jurisdictions, Natalie works on cases with local counsel throughout the country.

Natalie earned her undergraduate degree *magna cum laude* from the Pennsylvania State University in 1986 and was elected a member of Phi Beta Kappa Honor Society. Natalie earned her law degree *magna cum laude* from the Temple University School of Law in 1989. She acted as Managing Editor of the Temple Law Review. After clerking for Chief Judge Farnan in the United States District Court for the District of Delaware, Natalie began at the law firm of Schnader Harrison Segal & Lewis in late 1990. She practiced in many areas of complex commercial litigation, specifically including product liability, insurance coverage and defense, antitrust, contract and commercial lease areas.

In 1996, Natalie became an associate at the law firm of Mager Liebenberg & White, a well known class action firm, where her practice was concentrated in antitrust and consumer protection class action litigation. In 1998, Natalie became a Partner in the law firm of Liebenberg & White, concentrating in antitrust, civil rights, and consumer protection litigation.

Natalie's current practice is concentrated in the prosecution of consumer class actions (with an emphasis on financial services industry cases, payday lender cases, and insurance industry cases). Natalie represents consumers against mortgage lenders (challenging practice of charging mortgagees for prepaying the loan in violation of the parties' contract); credit card companies (challenging the imposition of improper add-on fees for such products as credit protection); and payday lenders (challenging the imposition of usurious interest rates without the proper disclosures). Natalie participated in a panel on Consumer Class Actions: How to Challenge Business Misconduct, on June 2-4, 2000. She authored "Practical Advice about MDL Practice and Procedures," Consumer Advocate, Volume 6, Issue 3, May/June 2000.

Natalie is also involved in many class actions in the health, life and property insurance industries. She has represented, and currently represents, policyholders in several cases alleging deceptive sales and marketing practices in connection with life or mortgage insurance policies. In addition, Natalie represents "whistleblowers" in cases brought under the United States False Claims Act. Natalie is also involved in prosecuting actions on behalf of physicians and authored "Y2K Creates Liability Minefield," Managed Healthcare News, May 1999.

Natalie also devotes a substantial portion of her practice to antitrust class action litigation and has represented plaintiffs and defendants in numerous court treble damages actions throughout the country. Natalie is a member of the American Bar Association, Pennsylvania Bar Association, Philadelphia Bar Association and the National Association of Consumer Advocates. She is also a former member of the Pennsylvania Bar Association Commission on Women in the Profession and the Temple American Inn of Court. She resides in Wallingford, Pennsylvania with her family.

**James E. Miller** is admitted to practice law in the state courts of Connecticut, Pennsylvania and New Jersey, as well as in the United States District Courts for the District of Connecticut, Eastern District of Pennsylvania, District of New Jersey, the United States Court of Appeals for the Third Circuit and the United States Supreme Court. In addition to these courts and jurisdictions, Jim has worked on cases with local counsel throughout the country.

Jim earned his undergraduate degree from Cornell University (B.S. 1988) and his law degree from the University of Pennsylvania School of Law (J.D. 1991). While at Penn Law School, he was awarded the Edwin R. Keedy Cup and was Editor of the Comparative Labor Law Journal. Following graduation, he served as Law Clerk to the Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania.

Jim began his law practice in 1992 at Pelino & Lentz, P.C. in Philadelphia, Pennsylvania and began concentrating his practice in labor and employment litigation, as well as other complex commercial litigation. He practiced at Pelino & Lentz until 2000 and was named a partner at the firm during his tenure. In addition to representing major corporations in commercial and employment litigation and collective bargaining negotiations, at Pelino & Lentz, Jim developed an extensive practice representing plaintiffs in employment discrimination litigation and securities industry professionals in U-5 defamation cases. In those cases, he was successful in obtaining a number of multi-million dollar recoveries, including jury verdicts and arbitration awards.

After relocating to Connecticut with his family in 2000, Jim became a member of a class action law firm with offices in Connecticut and Pennsylvania. At that firm, he concentrated his practice in civil rights/employment and other complex class action litigation, including securities, consumer and antitrust litigation. In addition to serving in a lead role in several consumer and securities class actions, he also represented both institutional and individual investors in major unsuitable trading and churning cases.

In 2002, Jim joined the Firm to open its office in Connecticut. Jim's practice is concentrated on the prosecution of significant employment and defamation cases, securities class actions (on behalf of defrauded shareholders of publicly-traded companies), consumer class actions, and unsuitable trading/churning cases. He also has significant experience in handling antitrust and other complex commercial matters, as well as representing plaintiffs in NASD and NYSE arbitrations. Finally, Jim serves as labor counsel for certain corporate clients of the Firm.

Jim is a member of the National Association of Securities and Consumer Law Attorneys, National Employment Lawyers Association, the American Bar Association, the Connecticut Bar Association, the New Jersey Bar Association, the Pennsylvania Bar Association and the National Association of Securities and Consumer Attorneys. He resides with his family in Chester, Connecticut and is active in community, political and charitable activities.

**James C. Shah** is admitted to practice law in the state courts of Pennsylvania and New Jersey, as well as in the United States District Court for the Eastern District of Pennsylvania and United States District Court for New Jersey. In addition to these courts and jurisdictions, he has also worked on cases with local counsel throughout the country.

James earned his Bachelor of Arts Degree in Political Science from the University of Oregon and his law degree from Temple University School of Law. James was a member of Temple's nationally acclaimed Trial Team and also participated on Moot Court. Before joining the Firm, James practiced as a litigator in Philadelphia with Pelino & Lentz, P.C., where he concentrated his practice on employment and labor law, securities disputes and general commercial litigation.

James is involved in all aspects of class action litigation including, among others, securities fraud, shareholder derivative actions, consumer fraud, products liability and antitrust. In addition to class actions, James also handles cases on behalf of individual investors who have lost money in their savings accounts and individual retirement accounts (IRAs) as a result of unauthorized or unsuitable trading by their brokers. These cases are typically arbitrated before the NASD and NYSE. James has successfully litigated cases in both forums.

James has been a member of the Association of Trial Lawyers of America and Philadelphia County Bar Associations. He resides in Collingswood, New Jersey with his family and is actively involved in the community in Southern New Jersey.

**Douglas P. Dehler** is admitted to practice law in the state courts of Wisconsin, as well as the District Courts for the Eastern and Western District of Wisconsin, and the United States Court of Appeals for the Seventh Circuit. In addition to these courts, Doug has worked on cases with local counsel throughout the country.

Doug received his undergraduate degree from Washington University (B.S.B.A cum laude 1987) in St. Louis, Missouri, and his law degree from the University of Wisconsin Law School (J.D. *cum laude* 1991) in Madison, Wisconsin. Upon graduating from law school, Doug joined the law firm of Michael, Best & Friedrich, LLP, in Milwaukee, Wisconsin, where he concentrated his practice on commercial and insurance litigation. In 1998, Doug became a Partner with Michael, Best & Friedrich, LLP, and served as the Chair of the firm's Insurance and Risk Management Focus Group.

Doug left Michael, Best & Friedrich, LLP in 2002 to take an in-house counsel position with Fortis Insurance Company, a national health insurance company with its corporate headquarters in Milwaukee, Wisconsin. While at Fortis Insurance Company, Doug was Vice President - Legal Risk Management, responsible for supervising a staff of in-house attorneys, paralegals and local attorneys around the country. These attorneys defended and prosecuted lawsuits on behalf of Fortis Insurance Company throughout the nation, and Doug was responsible for reporting to the company president and other senior management regarding the outcome of these lawsuits. In addition to his litigation responsibilities, Doug advised senior management regarding risk management and operational issues arising in the claims and underwriting units of the company.

Doug left Fortis Insurance Company in 2004 to return to private practice and started his own firm. In 2005, Doug joined the Firm and opened its office in Milwaukee, Wisconsin. Doug

is a Partner in the Firm and now focuses his practice on representing business clients, consumers and policyholders in class action lawsuits in Wisconsin and throughout the country. In addition, his practice includes bringing bad faith claims and coverage lawsuits against health and disability insurance companies that have wrongfully denied benefits. Doug also handles a number of other commercial and personal injury lawsuits.

Doug is a member of the Association of Trial Lawyers of America, the State Bar of Wisconsin and the Milwaukee Bar Association. He makes his home in Wauwatosa, Wisconsin, where he lives with his two children.

**Patrick A. Klingman** is Of Counsel to the Firm. Patrick is admitted to practice law in the state courts of Connecticut, New York and the District of Columbia, as well as the United States District Courts for the District of Connecticut, the Eastern, Southern, and Western Districts of New York, and the District of Columbia. In addition to these courts and jurisdictions, Patrick regularly works on cases throughout the country.

Patrick earned his undergraduate degree from Villanova University (B.A. 1987), and his law degree *cum laude* from Syracuse University College of Law in 1990. While at Syracuse, he also earned his master's degree in international relations from the Maxwell School of Citizenship and Public Affairs (M.A. 1990). Patrick also served as the Lead Article Editor for the Syracuse Journal of International Law and Commerce.

From 1990 through 1997, Patrick practiced at the Washington, D.C. law offices of Graham & James, L.L.P. and a predecessor firm, where he worked on a wide variety of complex litigation matters, ranging from aviation-related mass torts to intellectual property disputes, as well as other commercial litigation matters.

In 1997, Patrick moved with his family to Connecticut and joined a Hartford firm. Following this move, he continued his commercial litigation practice in actions as varied as defending a Hartford-based hospital in a contractual dispute in federal court to representing a dairy producer in a copyright action. In 2000, Patrick joined another class action firm based in Connecticut and began to focus on representing plaintiffs in securities, consumer fraud and antitrust litigation. In 2004, Patrick joined the Firm's Connecticut office, where he continues to represent plaintiffs in a variety of transactions while also representing the Firm's corporate and institutional clients in other commercial litigation.

Patrick is a member of the Connecticut Bar Association, the New York State Bar Association, the District of Columbia Bar Association, and the Hartford County Bar Association. He resides in West Hartford, Connecticut with his family and is active in community affairs.

**Laurie Rubinow** is Of Counsel to the Firm. Laurie is admitted to practice law in the state courts of Connecticut and Pennsylvania. In addition, Laurie has worked on cases with local counsel throughout the country.

Laurie earned her undergraduate degree from the University of California at Berkeley (B.A. 1980), where she was Phi Beta Kappa, graduated *summa cum laude*, and earned her law degree from Temple University School of Law (J.D. 1984). She also completed certain of her undergraduate studies at McGill University and, while at Temple Law School, she served as a

legal intern with the United States Attorney's Office, the Public Defender's Office, the Pennsylvania Attorney General's Office and for United States Magistrate Judge Powers. In addition, Laurie has received a Certificate in Negotiation, Mediation and Conflict Resolution from the Seton Hall University School of Law.

Laurie has a diverse legal background, having worked in private practice as an Associate at a law firm and as a solo practitioner for approximately five years before beginning a career as an in-house attorney at a nationally recognized insurance company, where she worked for approximately eleven years, rising to the position of National Manager, where she was responsible for the management of five regional field offices responsible for defending complex insurance related litigation, including toxic tort and environmental actions. She also has served as an Adjunct Professor in the Department of Sociology at Central Connecticut State University. Laurie joined the Firm's Connecticut office in 2005, where she represents plaintiffs in a variety of consumer, securities and insurance litigation. Laurie also is actively involved in the Firm's representation of the State of Connecticut in four complex cases against six different pharmaceutical manufacturers.

Laurie is a member of the Connecticut Bar Association. She resides in Chester, Connecticut with her family and is active in community affairs.

**Stephen M. Donweber** is Of Counsel to the Firm. Steve is admitted to practice law in the state courts of Pennsylvania and New Jersey, as well as in the United States District Courts for the Eastern District of Pennsylvania, Middle District of Pennsylvania, District of New Jersey, and the United States Court of Appeals for the Third Circuit. In addition to these courts and jurisdictions, Steve has worked on cases with local counsel throughout the country.

Steve earned his undergraduate degree from Cornell University (A.B. 1989) and his law degree from the Villanova University School of Law (J.D. *cum laude* 1993). While at Villanova Law School, Steve served as Managing Editor of Articles for the Villanova Law Review, was awarded the Law Review Distinguished Service Award, and had his case note, *NLRB v. New Jersey Bell*: The Current Scope of Weingarten Rights in the Third Circuit, published at 37 Vill. L. Rev. 1139 (1992). In addition, Steve was a member of the Order of the Coif, as well as Phi Kappa Phi Honor Society.

In 1993, directly after law school, Steve joined the law firm of Saul Ewing LLP in Philadelphia, Pennsylvania. In his ten years at Saul Ewing, Steve concentrated his practice in complex commercial litigation, with particular emphasis on litigation regarding fundamental corporate transactions, complex bankruptcy litigation, and antitrust cases.

Steve is a member of the Philadelphia, Pennsylvania, and American Bar Associations. He and his wife reside in Boston, Massachusetts.

**Gary Kostow** is Of Counsel to the Firm. Gary earned his Juris Doctor from the Illinois Institute of Technology, Chicago-Kent College of Law in May, 1973, where he served as Editor-in Chief of the Chicago-Kent Law Review and graduated "with distinction." Following graduation, Gary served a one-year judicial clerkship with the Honorable John J. Sullivan of the Illinois Appellate Court. After his clerkship, Gary joined the Chicago firm of Clausen, Miller, where he became a partner and member of the managing board of directors within four years.

Gary has been admitted to practice in Illinois since 1973, and is also admitted to practice before the United States District Court for the Northern District of Illinois, other federal district courts and the Seventh Circuit Court of Appeals, and is a member of the Federal Trial Bar. Throughout his career, Gary's practice has represented a wide variety of clients, including closely-held and publicly-owned corporations, physicians, hospitals and other health care providers (in medical malpractice claims), condominium associations, architects and engineers. Beginning in 1983, Gary expanded his practice and began representing attorneys and law firms in defense of legal malpractice claims.

Over Gary's career, he has been retained on a number of notable engagements. For instance, for many years, he represented intellectual property firms in significant legal malpractice claims. He was one of two attorneys in the United States hired by the leading underwriter of patent firms to monitor and consult on pending patent related malpractice cases, and recently, this same underwriter retained him to review a pending claim against a prominent intellectual property firm where a claim of $27 million was being made. He was retained to represent a national law firm before the Honorable Thomas Penfield Jackson, in Washington, D.C. in a multi-million dollar claim brought by a failed government contractor. Gary represented banks such as LaSalle National Bank, Melrose National Bank, and Merchandise National Bank in a variety of matters ranging from Uniform Commercial Code claims, forged instrument claims, inter-bank disputes and customer work-out matters.

Gary also successfully tried an $11 million claim for lost management fees and commissions made by a prominent Philadelphia real estate concern before former Judge Paul Dorf in Baltimore, Maryland. In 1997, Gary was appointed by Judge Lee of the United States District Court in Fort Wayne, Indiana to mediate a $40 million securities fraud claim involving the sale of interest in communication satellite slots owned by the Kingdom of Tonga.

In 1992, Gary and Henry Daar founded the Chicago-based law firm of Kostow & Daar, P.C., which became a national litigation firm handling such matters as the Meridian Bank building fire case pending in New York City (involving a claim of $450 million); the Alcoa and PPG property environmental coverage litigation (involving multi-billion dollar claims); the All-Alaskan vessel loss (involving a potential claim of $125 million); the Global Gaming and IGT patent infringement claim ($30 million); and a number of substantial property damage, time element, and sick building claims on behalf of such companies as Allied Signal, Cytec, American Airline, and Kohler. Additionally, Gary represented contractors, design professionals and others in a variety of claims. Gary retired from the Kostow & Daar firm in 1997.

Over the past ten years, Gary has become actively involved in the class action bar, successfully prosecuting separate national class action antitrust cases against Bayer A.G., Miles, Inc., Dial Corp., and S.C. Johnson & Son. Gary has practiced with the Firm since 2003 and offers a unique perspective, drawn from thirty years of experience litigating complex cases.

**Paul M. Rettinger** is Of Counsel to the Firm. Paul is admitted to practice in the state courts of Pennsylvania, as well as in the United States District Court for the Eastern District of Pennsylvania, and the United States Court of Appeals for the Third Circuit. Paul earned his undergraduate degree from the University of Pittsburgh, and did graduate studies in biology and chemistry at the Pennsylvania State University and the University of Pennsylvania. Paul graduated *cum laude* from the Temple University School of Law in 1996, where he was a member of the Environmental Law Council and the Environmental Law and Technology Journal.

-10-

Before entering law school, Paul worked in biomedical research at the Transplant Laboratory of the University of Pittsburgh School of Medicine, and at the Cerebrovascular Research Center of the University of Pennsylvania. After graduation, Paul served for five years as Assistant Counsel to the Pennsylvania Department of Environmental Protection (DEP), primarily in major Superfund litigation. After leaving the DEP, Paul worked as a consultant to the insurance industry, providing training for professional certification examinations for liability underwriters.

Paul is co-author of "EEG Spectroanalysis of Acute Focal Ischemia Under Halothane Anesthesia Using Glutamate Antagonist MK-801," published in the Klinikai Kislerleti Kutato es II, Elettani Intezet, SOTE, June 1990; and "Private Rights of Action Under State Unfair Claims Settlement Practices Acts," published in the Journal of Insurance Regulation, Spring 1998, v. 16. He resides with his family in Chadds Ford, Pennsylvania.

**Tali Joan Segal** is Of Counsel to the Firm. Tali earned her undergraduate degree from Emory University (B.A. 1982), where she was elected a member of Phi Beta Kappa Honor Society and where she served as an award-winning editor-in-chief of the university newspaper, *The Emory Wheel*. She also served as an assistant to former President Jimmy Carter while at Emory. Tali earned her law degree from the National Law Center, George Washington University (J.D. 1986), following which, she served an administrative law clerkship with the Honorable Ralph A. Romano of the U.S. Department of Labor.

After her clerkship, Tali practiced as a commercial litigator and corporate transactional lawyer with the Philadelphia firms of Markowitz & Meo, P.C. (later Markowitz, Meo, Silberman & Raslavitch, P.C.) and Rawle & Henderson. She also established and was the managing attorney of Markovitz & Meo's New Jersey office. Tali concentrated her practice in complex and general commercial, business and civil litigation, including construction law and bankruptcy law, and also served as an arbitrator for the Philadelphia Court of Common Pleas. Tali is admitted to practice law in Pennsylvania and in the United States District Court for the Eastern District of Pennsylvania and works on cases with local counsel throughout the country.

Tali began her involvement in the class action bar in 1995. She has been involved in securities fraud class actions (on behalf of defrauded shareholders of publicly-traded companies), consumer fraud class actions, unsuitable trading/churning cases and antitrust matters. Over the past year, she has been extensively involved in the Average Wholesale Price (AWP) drug industry multidistrict litigation. Tali resides in Fort Washington, Pennsylvania with her family and is involved in many community activities.

**Karen M. Leser-Grenon** is an Associate in the firm. She is admitted to practice law in the state courts of Connecticut and California, as well as in the United States District Court for the District of Connecticut. She is also registered to practice before the United States Patent and Trademark Office. In addition to these courts and jurisdictions, Karen works on cases nationwide. Karen earned her Bachelor of Science Degree in Civil Engineering from the University of Maryland at College Park (B.S. 1997) and her law degree from Quinnipiac University School of Law (J.D. 2001).

Before joining the Firm, Karen practiced law in Connecticut and California, where she concentrated her practice on securities, antitrust, consumer class action and intellectual property

litigation. In 2005, Karen joined the Firm's office based in Chester, Connecticut, where she continues to represent plaintiffs in complex litigation. Karen is a member of the American Bar Association, Connecticut Bar Association, California Bar Association, American Intellectual Property Law Association and Connecticut Trial Lawyers Association. She resides in Madison, Connecticut and is active in her community.

**Nathan Zipperian** is an Associate in the firm. He is admitted to practice law in the state courts of Oregon, Arizona, Pennsylvania and New Jersey, as well as in the United States District Court for the District of Arizona. In addition to these courts and jurisdictions, Nathan works on cases throughout the country.

Nathan earned his Bachelor of Arts Degree in Political Science from the University of Oregon and his law degree from Temple University School of Law. While at Temple, Nathan was an Editor of the Environmental Law and Technology Journal. Before joining Shepherd, Finkelman, Miller & Shah, LLC, Nathan was a litigator in Oregon at Bailey Pinney and Associates, where his practice focused on employee rights and in Arizona with Martin Hart & Fullerton, where he litigated a wide variety of cases including personal injury, medical malpractice and product liability cases.

Nathan joined the Firm in 2005 and is involved in all aspects of the Firm's class action practice. Nathan is a member of the American Bar Association, Oregon Bar Association, Arizona Bar Association, Maricopa County Bar Association and Arizona Association of Defense Counsel. He resides with his family in Swedesboro, New Jersey and is actively involved in the Southern Jersey community.

1   RESUME FOR KEMNITZER, ANDERSON, BARRON, OGILVIE & BREWER LLP

2       Founded in 1983, KABOB is at the forefront of consumer protection law. Attorneys in the

3   firm have represented over 5,000 individuals in lemon law cases. KABOB's victories in

4   California Lemon Law appeals stand as precedent for all trial courts in California. KABOB's

5   attorneys have testified in front of the California legislature to ensure that California's lemon law

6   provides the maximum protection to consumers.

7

8       Mark F. Anderson of KABOB has practiced law in San Francisco for 37 years. For the

9   last 23 years, his practice has principally has been the representation of consumers in lemon law

10  and consumer class actions.  Mark F. Anderson has participated as counsel or co-counsel for

11  plaintiffs in many class actions, including the following actions relating to automobile

12  manufacture's defects:

13
    Dilsworth v Kia Motors of America (Alameda County Superior Court) (class action on Sephia
14  models with brake defects) (settled).

15  Ciabattari v Toyota Motor Sales USA (N.D. Calif. 2006) (class action settlement on behalf of 57,000
    owners of Toyota Sienna vans with defective run-flat tires);
16
    Morris v BMW of North America, Inc. (N.D. Calif.) (pending class action on behalf of owners of
17  2006 and 2007 3 series BMWs with defective run-flat tires);

18  Olson v Am Honda Motor Company (Alameda County Superior Court) (pending class action on
    behalf of owners of 2005 and 2006 Honda Odyssey vans with Michelin PAX tires);
19
    O'Connor v General Motors (E.D. Calif) (pending action on behalf of owners of 2005 and 2006
20  Pontiac GTO's with tire damage due to impact on front struts):

21  Colon v Land Rover of North America, Inc. (Santa Clara County Superior Court) (pending action on
    behalf of owners of LR3 models with excessive tire wear).
22
        Additional information concerning the firm is at www.kaboblaw.com.
23

24

25

26

27

28

                                        1

# EXHIBIT 11

1

***CONFIDENTIAL****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CIVIL ACTION NO. C 07 2827 WHA

KEVIN MORRIS, GLENN R. SEMOW and
CHAD J. COOK, on behalf of themselves
And all others similarly situated,

       Plaintiffs,               :

                                   :

       vs.

                                   :

BMW OF NORTH AMERICA, LLC,

                                   :

       Defendant.

--------------------------------------

DEPOSITION UNDER ORAL EXAMINATION OF:
FRANK GALLACHER
January 25, 2008
-----------

REPORTED BY:  JENNIFER L. REALMUTO, CSR
------------

ESQUIRE DEPOSITION SERVICES
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095
(732) 283-1008 or (800) 247-8366

JOB #  214781

6

18

1  2001.
2      Q.    Where, in terms of physically, what
3  address did you work from during your ten years as a
4  national technical specialist?
5      A.    The same address that I had provided
6  earlier, One BMW Plaza.
7      Q.    What were your job responsibilities
8  as national technical specialist?
9      A.    I worked at our technical hotline
10 which provides technical support to BMW dealers.
11     Q.    Was that support that you were
12 providing to dealerships regarding specific BMW makes
13 and models or all BMW makes and models?
14     A.    It was all BMW makes and models.
15     Q.    In your capacity as the national
16 technical specialist, did you have the authority or
17 ability to provide goodwill to customers --
18     A.    No.
19     Q.    Goodwill accommodations, I'm sorry.
20     A.    Excuse me.
21     Q.    I'll take the blame for that one.
22     A.    The answer is no.
23     Q.    Who did you report to while you were
24 a technical specialist?
25     A.    During the course of my tenure in

19

1  that job, I had three different bosses.  Initially, I
2  reported to Paul Manzer.
3      Q.    Can you spell the last name for the
4  court reporter, please?
5      A.    M-A-N-Z-E-R.
6      Q.    And the other two individuals?
7      A.    The other two, there was Bob Frisch,
8  F-R-I-S-C-H and also Ray Schroth, S-C-H-R-O-T-H.
9      Q.    What was Mr. Manzer's position?
10     A.    He was the supervisor for the
11 national technical hotline.
12     Q.    And did the other two gentleman
13 also -- were they also in that same position or role?
14     A.    No, Mr. Frisch was a department head
15 within the after sales department and Mr. Schroth was
16 a department head within the service engineering
17 department.
18     Q.    Were all three of those individuals
19 based in Montvale, New Jersey?
20     A.    No, Mr. Manzer and Mr. Frisch were
21 both based in Woodcliff Lake, New Jersey.  Oh, you
22 know, I have to correct myself.  There was another
23 person that held the job for a short period and his
24 name was Tom Nasser.
25     Q.    Was Mr. Nasser also based in

20

1  Woodcliff Lake, New Jersey?
2      A.    Yes.
3      Q.    And in about 2001, you changed
4  positions within BMW?
5      A.    That's correct.
6      Q.    What was your new position?
7      A.    Product engineer.
8      Q.    Was that a position that you had
9  applied for internally or how did you come to become
10 the product engineer?
11     A.    I did apply for a position internally
12 for a product engineer and it was for -- it had
13 specific responsibilities or sections of the car it
14 had to deal with.  In other words, I applied for a
15 product engineer job for electrical and I received
16 the job I have now.
17     Q.    So what -- in terms of your title as
18 of 2001, was it product engineer for electrical or
19 was it just product engineer, but you were working on
20 electrical matters?
21     A.    It was specifically for chassis
22 issues or chassis with the exception of wheels and
23 tires.
24     Q.    From 1997 to 2001, had you had any --
25 received any training in terms of chassis issues?

21

1      A.    I continued with the BMW training,
2  which covered all manner -- all aspects of the
3  vehicles.
4      Q.    And when you became a product
5  engineer in 2001, who did you report to?
6      A.    Iwan Sutedjo, I-W-A-N Sutedjo,
7  S-U-T-E-D-J-O.
8      Q.    And what was Mr. Sutedjo's title?
9      A.    He was the section manager for the
10 body and chassis group.
11     Q.    Where was Mr. Sutedjo located?
12     A.    One BMW Plaza also.
13     Q.    What were your job responsibilities
14 as a product engineer?
15     A.    To monitor product quality and
16 provide reporting and feedback on repair solutions.
17     Q.    Were your job responsibilities
18 limited to a specific subset of makes and models of
19 BMWs?
20     A.    No.
21     Q.    In the context of performing your
22 duties of monitoring product quality, how would you
23 go about doing that?
24     A.    Essentially, I received feedback from
25 three main areas:  Customer relations, product --

58

1  service bulletin?
2      A.    That's my understanding.
3      Q.    In addition to the modification of
4  the belt packs, are you aware of any other
5  modifications that were made by Bridgestone to the
6  17-inch Turanza tire?
7      A.    No.
8      Q.    And with respect to the 16-inch
9  Turanza tire, at some point in time, was that tire --
10  the 16-inch Turanza tire that was the subject of the
11  service bulletin, at some point in time was the
12  16-inch Turanza tire modified?
13      A.    Yes.
14      Q.    When was that?
15      A.    Again --
16      Q.    Going back to -- let me -- at what
17  point in time was a modified Turanza 16-inch tire
18  made available such that dealerships could utilize it
19  as a replacement tire on a vehicle?
20      A.    That has happened just recently,
21  January 2008.
22      Q.    What modification or modifications
23  were made to the 16-inch tire?
24      A.    My understanding is that the same
25  modifications were made as the 17-inch tire, with the

59

1  addition of what is sometimes referred to as a tie
2  bar, T-I-E B-A-R and this would be a -- I guess the
3  best way to describe it is the linking together of
4  the tread blocks in these areas.
5      Q.    And when you say "in these areas",
6  what areas are you referring to?
7      A.    The tread blocks along the inner and
8  outer shoulders of the tire.
9      Q.    Were those -- as was the case with
10  the modifications for the 17-inch tire, were the
11  modifications for the 16-inch tire made to address
12  the irregular tire wear that was the subject of the
13  service bulletin?
14      A.    That is my understanding.
15      Q.    Were you involved personally with
16  anyone at Bridgestone regarding modifications to the
17  17-inch tire?
18      A.    You mean inquiries or -- I'm sorry,
19  I'm not.
20      Q.    In any capacity, did you have
21  communications with anyone from Bridgestone regarding
22  modifications to the 17-inch tire?
23      A.    Yes.
24      Q.    What did those communications consist
25  of?

60

1      A.    E-mails, phone calls.
2      Q.    With whom did you communicate at
3  Bridgestone?
4      A.    Tim Marantis.
5      Q.    I hate to ask you to spell yet
6  another name.
7      A.    M-A-R-A-N-T-I-S.
8      Q.    And what's Mr. Marantis's position at
9  Bridgestone?
10      A.    I believe his title is OE accounts
11  manager.  That would signify original equipment.
12      Q.    When did you first have any
13  communication with Mr. Marantis about modifications
14  to the 17-inch tire?
15      A.    To be honest with you, I don't
16  recall.  I would say it would have had to have been
17  some time during 2006.
18      Q.    Prior to the issuance of the service
19  bulletin?
20      A.    Yes.
21      Q.    With respect to the service bulletin
22  which was issued in January 2007, when did you first
23  become aware of complaints regarding irregular tire
24  wear on the Bridgestone Turanza tires equipped on the
25  3 Series BMWs?

61

1      A.    January of 2006.
2      Q.    How were you made aware of those
3  complaints?
4      A.    They came to us via the hotline in
5  PuMA.
6      Q.    What, if anything, did you do,
7  beginning in January of '06, after receiving
8  complaints about the irregular tire wear on the
9  Turanza -- irregular tire wear -- the irregular
10  Turanza tire wear?
11      A.    We started to request additional
12  information through the PuMA system to the dealers.
13      Q.    And when you say "we", who's the we?
14      A.    I informed the hotline to request
15  some additional information from the dealers.
16      Q.    What additional information did you
17  request or did you inform the hotline to request?
18      A.    Tire pressures, tread depths,
19  alignment data.
20      Q.    Did you receive that information
21  back?
22      A.    In some cases, yes.
23      Q.    What, if anything, did you do with
24  the information you received back?
25      A.    I reviewed it and I also had some

54

1    A.    Popp, P-O-P-P.
2    Q.    What is Mr. Popp's title?
3    A.    I believe his current title is
4 warranty analyst.
5    Q.    And then you said that the claim is
6 submitted to BMW A.G., correct?
7    A.    Yes.
8    Q.    When you say BMW A.G., what are you
9 referring to?
10    A.    BMW Germany.
11    Q.    Do you know who if anyone at BMW A.G.
12 has oversight of the claims as they're received by
13 that entity?
14    A.    I do not know.
15    Q.    Going further down the second page of
16 the service bulletin, Mr. Gallacher, there's a bullet
17 point immediately above the words "part number", that
18 says "Bridgestone tires when available will be used
19 for replacement."
20        Do you see that?
21    A.    Yes.
22    Q.    As of January 2007, when the service
23 bulletin was issued, were there Bridgestone Turanza
24 tires available that were in -- that were different
25 than the tires that were the subject of this service

55

1 bulletin that were being placed on the vehicles?
2    A.    Yes.
3    Q.    And what were those tires?  What were
4 the tires?
5    A.    I --
6    Q.    Let me take a step back.  My question
7 is at the time that the service bulletin was issued
8 and there's reference to Bridgestone tires being used
9 as replacement tires, were the tires that were being
10 used as replacement tires under the service bulletin
11 the same or different than the Turanza tires that
12 were the subject of the service bulletin?
13    A.    The 17-inch tires were different.
14    Q.    Was there another -- was there also a
15 16-inch tire, Turanza tire that had been placed on
16 certain of the 3 Series vehicles?
17    A.    Yes.
18    Q.    As of January 2007, were the 16-inch
19 tires different?
20    A.    No.
21    Q.    To your knowledge, if a consumer came
22 in needing 16-inch tires replaced were the same
23 16-inch Turanza tires that were the subject of the
24 service bulletin being placed on the vehicles?
25    A.    Yes, if they were available, yes.

56

1    Q.    In what manner were the 17-inch tires
2 different from the Turanza tires that were the
3 subject of the service bulletin?
4    A.    There had been some internal changes
5 to the tire.
6    Q.    What were those changes?
7    A.    It was in regard to the way the belt
8 packs are laid out within the construction of the
9 tire.
10    Q.    When were those changes made?
11    A.    When, from a tire standpoint or a car
12 standpoint?
13    Q.    At what point in time, well, let's
14 break it down.
15        At what point in time were the
16 17-inch tires that had been modified made available
17 to be placed on 3 Series vehicles?  In other words,
18 at some point in time Bridgestone modifies the tire,
19 that tire then becomes available to the market.  So
20 my question is when was the modified 17-inch tire
21 first available to the market such that a dealership
22 would have had access to it to put it on a 3 Series
23 vehicle.
24    A.    In January of 2007.
25    Q.    And did that coincide then with the

57

1 release of the service bulletin or the issuance of
2 the service bulletin?
3    A.    Yes.
4    Q.    Were dealerships -- well, let me ask
5 this:  There's nothing in the service bulletin that
6 instructs dealerships not to place the 16-inch
7 Turanza tires that were the subject of the service
8 bulletin on 3 Series vehicles as replacement tires,
9 correct?
10    A.    Yes.
11    Q.    Was there any separate directive to
12 dealerships not to place as replacement tires the
13 16-inch Turanza tires that were the subject of the
14 service bulletin on 3 Series vehicles?
15    A.    To the best of my knowledge, no.
16    Q.    You indicated that the 17-inch
17 Turanza tire had been modified with respect to the
18 belt packs; is that correct?
19    A.    Yes.
20    Q.    What is your understanding of the
21 reason for that modification?
22    A.    To improve the tire's wear
23 characteristic.
24    Q.    Was that specifically with regard to
25 the irregular tire wear that was the subject of the

58

1  service bulletin?
2      A.      That's my understanding.
3      Q.      In addition to the modification of
4  the belt packs, are you aware of any other
5  modifications that were made by Bridgestone to the
6  17-inch Turanza tire?
7      A.      No.
8      Q.      And with respect to the 16-inch
9  Turanza tire, at some point in time, was that tire --
10 the 16-inch Turanza tire that was the subject of the
11 service bulletin, at some point in time was the
12 16-inch Turanza tire modified?
13     A.      Yes.
14     Q.      When was that?
15     A.      Again --
16     Q.      Going back to -- let me -- at what
17 point in time was a modified Turanza 16-inch tire
18 made available such that dealerships could utilize it
19 as a replacement tire on a vehicle?
20     A.      That has happened just recently,
21 January 2008.
22     Q.      What modification or modifications
23 were made to the 16-inch tire?
24     A.      My understanding is that the same
25 modifications were made as the 17-inch tire, with the

59

1  addition of what is sometimes referred to as a tie
2  bar, T-I-E B-A-R and this would be a -- I guess the
3  best way to describe it is the linking together of
4  the tread blocks in these areas.
5      Q.      And when you say "in these areas",
6  what areas are you referring to?
7      A.      The tread blocks along the inner and
8  outer shoulders of the tire.
9      Q.      Were those -- as was the case with
10 the modifications for the 17-inch tire, were the
11 modifications for the 16-inch tire made to address
12 the irregular tire wear that was the subject of the
13 service bulletin?
14     A.      That is my understanding.
15     Q.      Were you involved personally with
16 anyone at Bridgestone regarding modifications to the
17 17-inch tire?
18     A.      You mean inquiries or -- I'm sorry,
19 I'm not.
20     Q.      In any capacity, did you have
21 communications with anyone from Bridgestone regarding
22 modifications to the 17-inch tire?
23     A.      Yes.
24     Q.      What did those communications consist
25 of?

60

1      A.      E-mails, phone calls.
2      Q.      With whom did you communicate at
3  Bridgestone?
4      A.      Tim Marantis.
5      Q.      I hate to ask you to spell yet
6  another name.
7      A.      M-A-R-A-N-T-I-S.
8      Q.      And what's Mr. Marantis's position at
9  Bridgestone?
10     A.      I believe his title is OE accounts
11 manager.  That would signify original equipment.
12     Q.      When did you first have any
13 communication with Mr. Marantis about modifications
14 to the 17-inch tire?
15     A.      To be honest with you, I don't
16 recall.  I would say it would have had to have been
17 some time during 2006.
18     Q.      Prior to the issuance of the service
19 bulletin?
20     A.      Yes.
21     Q.      With respect to the service bulletin
22 which was issued in January 2007, when did you first
23 become aware of complaints regarding irregular tire
24 wear on the Bridgestone Turanza tires equipped on the
25 3 Series BMWs?

61

1      A.      January of 2006.
2      Q.      How were you made aware of those
3  complaints?
4      A.      They came to us via the hotline in
5  PuMA.
6      Q.      What, if anything, did you do,
7  beginning in January of '06, after receiving
8  complaints about the irregular tire wear on the
9  Turanza -- irregular tire wear -- the irregular
10 Turanza tire wear?
11     A.      We started to request additional
12 information through the PuMA system to the dealers.
13     Q.      And when you say "we", who's the we?
14     A.      I informed the hotline to request
15 some additional information from the dealers.
16     Q.      What additional information did you
17 request or did you inform the hotline to request?
18     A.      Tire pressures, tread depths,
19 alignment data.
20     Q.      Did you receive that information
21 back?
22     A.      In some cases, yes.
23     Q.      What, if anything, did you do with
24 the information you received back?
25     A.      I reviewed it and I also had some

90

1  Those claims would, in turn, be sent back to BMW A.G.
2  BMW A.G. would, in turn, forward the claims to
3  Bridgestone in Europe and Bridgestone in Europe would
4  have the ability to approve or deny claims and to
5  issue payment.
6       Q.    And to the extent that Bridgestone
7  Europe accepted a claim -- strike that.
8            Under the agreement between BMW --
9  the various BMW entities and the various Bridgestone
10 entities, with respect to a claim submitted pursuant
11 to the service bulletin, say for example, the tires
12 were replaced prior to 10,000 miles so that all the
13 tires would be covered 100 percent labor and parts,
14 if that claim was ultimately accepted by Bridgestone
15 Europe, what percentage of the claim would
16 Bridgestone Europe reimburse BMW?
17      A.    My understanding is 100 percent.
18      Q.    Was that true with respect to parts?
19      A.    Yes.
20      Q.    Is that also true with respect to
21 labor?
22      A.    Yes.
23      Q.    And if BMW Europe denied the claim?
24      A.    If Bridgestone -- I'm sorry.
25      Q.    If Bridgestone Europe denied the

91

1  claim, would there be any reimbursement?
2       A.    No, that -- no.
3            MR. BRISBOIS:  To be fair, Mr. Shah,
4  there's another procedure after the claim is denied.
5  I don't know if you want to ask him what happens
6  after the claim is denied.
7       Q.    Thank you.  If the claim is denied,
8  what happens after that point?
9       A.    If the claim is denied, then a debit
10 would be issued backwards from BMW A.G. to BMW NA and
11 in turn, to the dealership.
12           (Exhibit Gallacher-7, Memo, May 16,
13 2006, was marked for Identification by the court
14 reporter.)
15      Q.    You've been handed a document marked
16 Gallacher-7. It's a two-page document, MOR 01187 to
17 MOR 01188.  Your name does not appear on this e-mail.
18 Do you know who Bruce Baker is?
19      A.    Yes, he's the manager for the quality
20 reporting group.
21      Q.    Where is he based?
22      A.    In -- at One BMW Plaza.
23      Q.    And I believe you earlier mentioned
24 Michael Kiehne's name?
25      A.    Kiehne.

92

1       Q.    You're familiar with who he is as
2  well?
3       A.    Yes.
4       Q.    In the center of the page, there's a
5  notation that says numerous -- and this is also an
6  e-mail dated May 16, 2006.
7            It states "Numerous complaints of
8  uneven tire wear and noise beginning as low as 7,000
9  miles."
10           Do you see that?
11      A.    Uh-huh.
12      Q.    In the course of your investigation
13 into the Turanza tire wear issue, did you, in fact,
14 see complaints of uneven tire wear and noise
15 beginning as low as 7,000 miles?
16      A.    Yes.
17      Q.    Did you see complaints beginning at
18 even less than 7,000 miles?
19      A.    I think so, to the best of my
20 recollection, yes.
21      Q.    Switching for a moment to the Potenza
22 tires, that were equipped for the sport packaged
23 vehicles, did you ever see complaints of uneven tire
24 wear and noise beginning as low as 7,000 miles with
25 respect to the Potenza tires?

93

1       A.    I don't recall.
2            (Exhibit Gallacher-8, Memo, July 18,
3  2006, was marked for Identification by the court
4  reporter.)
5       Q.    Mr. Gallacher, you've been handed a
6  document -- two-page document marked Gallacher-8 MO
7  01039 through MOR 01040.
8            Can you identify this document?
9       A.    This is a string of e-mails in which
10 I and other individuals are involved --
11      Q.    And this is --
12      A.    -- related to the bulletin.
13      Q.    If you could turn to the second page
14 for me, please.  It appears to be an e-mail from you
15 dated July 13, 2006; is that correct?
16      A.    Yes.
17      Q.    And in the middle of the e-mail, you
18 are stating the cost of replacement tires under the
19 service bulletin.  Do you see that?
20      A.    Well --
21      Q.    Let me ask you this way:  What does
22 the dollar values for the 17 and 16-inch Turanza
23 tires reflected there mean?
24      A.    That would mean the replacement cost
25 under the current guidelines that were listed in the

94

1 bulletin there, yes.
2    Q.    And when you say in that bulletin,
3 you're referring to the draft bulletin --
4    A.    The draft.
5    Q.    -- existing as of July of 2006?
6    A.    Yes.
7    Q.    As of July 13, 2006. How were those
8 numbers calculated?
9    A.    To the best of my recollection, they
10 were with dealer net price of the tire, plus a $20
11 fee for labor and a $10 shipping fee. That's my best
12 recollection of that calculation.
13        (Exhibit Gallacher-9, Memo, November
14 28, 2006, was marked for Identification by the court
15 reporter.)
16    Q.    Mr. Gallacher, you've been handed a
17 document marked Gallacher-9 which is Bates stamped
18 MOR 01036. Can you identify this document.
19    A.    It's an e-mail from Tim Marantis to
20 myself regarding a meeting.
21    Q.    This is from November 28, 2006?
22    A.    Yes.
23    Q.    I direct your attention to the last
24 sentence. It says "As we discussed, we weren't sure
25 how to indicate that this customer satisfaction

95

1 program should be a one-time tire replacement event
2 per VIN."
3        Do you see that?
4    A.    Yes, I do.
5    Q.    Was your understanding with respect
6 to what that sentence means or meant at the time?
7    A.    That Bridgestone USA wanted to add
8 that provision.
9    Q.    When you say that provision, if you
10 are talking about the one time tire replacement event
11 per VIN?
12    A.    Yes.
13    Q.    And was that provision ever added to
14 the service bulletin?
15    A.    No.
16    Q.    Did you have an understanding as to
17 why Bridgestone wanted to add that provision in the
18 service bulletin?
19    A.    No.
20    Q.    Did you ever have any discussion with
21 Mr. Marantis or anyone else from Bridgestone about
22 that provision?
23    A.    No.
24    Q.    Do you know who made the
25 determination not to include that provision in the

96

1 final service bulletin?
2    A.    No.
3        MR. SHAH:  We've been going for
4 another hour so do we need time. I'll switch gears
5 here anyway.
6        (A brief recess was taken.)
7        MR. BRISBOIS:  We're back on the
8 record. Mr. Shah I had mentioned to you on break
9 that Mr. Gallacher indicated to me he thought one of
10 his answers required clarification. So with your
11 permission, he'd just like to clarify a prior answer.
12        MR. SHAH:  Sure, go ahead, Mr.
13 Gallacher.
14    A.    As I recall, you had asked me if
15 there were any other directives related to this issue
16 other than the bulletin.
17    Q.    And we're talking about the irregular
18 tire wears, right?
19    A.    Yeah, the bulletin B 36 06 06.
20    Q.    Yes.
21    A.    And you had asked me whether there
22 were any other directives related to this issue but
23 not outlined in the bulletin and again there is an
24 e-mail here where we had advised --
25        MR. BRISBOIS:  Just give him the

97

1 answer.
2    A.    We had advised that if a customer
3 requested a Continental claim in respect -- or a
4 different tire in respect to this bulletin, he could
5 receive it. I just wanted to clarify that.
6    Q.    I appreciate the clarification, Mr.
7 Gallacher. In kind of keeping with that
8 clarification, referring you back to the service
9 bulletin, on the bottom of the second page, going
10 into the third page, it states, "If the specified
11 Bridgestone tires are not available, please contact
12 the BMW tire center for other BMW approved tires that
13 can be used as substitutes."
14        And you just clarified that one of
15 the -- that the directive that was given to
16 dealerships was that they could use Continental tires
17 as a substitute in the absence of -- let me ask that,
18 is that true only in the absence of a supply of the
19 Turanza tires or was that an option even if there was
20 a supply of the Turanza tires?
21    A.    The dealership could install an
22 alternate tire if there was an absence of the Turanza
23 tire. We told the field people that if they had a
24 customer request, they could also do the same, that
25 if the customer insisted.

150

1          Can you identify this document?
2     A.     It's an e-mail correspondence between
3 myself and Volker Hader.
4     Q.     And it was an e-mail that you sent on
5 June 19, 2006, correct?
6     A.     That's correct.
7     Q.     And in it, among other things, you
8 state, "With the case of the Bridgestone Turanza, we
9 should ask for a mileage limit of 30,000 miles. I
10 know we discussed coverage to 25,000 miles, but I
11 think we should start with 30,000 miles and then we
12 can negotiate."
13          Do you see that?
14     A.     Yes.
15     Q.     What was your basis for starting with
16 the 30,000 mile limit?
17     A.     Simply because I would expect to get
18 less.
19     Q.     When you say you'd expect to get
20 less, what do you mean by that?
21     A.     That we wouldn't get offered 30,000
22 miles, that there would be some negotiation.
23     Q.     In other words, when you say you
24 would expect to get less, you're talking about from
25 your standpoint what Bridgestone would be willing to

151

1 take the mileage out to in connection with any
2 service bulletin, correct?
3     A.     I wouldn't say that it was an -- in
4 specific respect to Bridgestone, but simply to -- as
5 a general technique to ask for more in the beginning.
6          MR. SHAH:  Off the record.
7          (A discussion was held off the
8 record.)
9     Q.     What is your understanding as to what
10 the expectation for the tire wear mileage-wise on the
11 Turanza tires should be?
12          Let me clarify, on the pre-modified
13 tires, the ones that came factory equipped before the
14 modifications were made?
15     A.     I need you to clarify what you mean
16 by expectation of "tire wear".
17     Q.     I'm sorry.  I'm talking from a
18 mileage perspective.
19          What is your understanding as to what
20 the BMW's expectation was regarding what the mileage
21 on the pre-modified Turanzas would be before they
22 would have to be replaced?
23          MR. BRISBOIS:  I object.  It calls
24 for speculation as to what BMW thought it might be.
25 I have no objection if you ask this witness what he,

152

1 in fact, thought it were.
2     Q.     Fair enough.
3          What was your understanding as to
4 what that number would be?
5          MR. BRISBOIS:  Would be or was?
6          MR. SHAH:  Was.
7     A.     Again, I want to -- do you mean at
8 what point would the tire have to be replaced because
9 it was worn out to the --
10     Q.     Correct.
11     A.     To the --
12     Q.     Absent the irregular tire wear?
13          MR. BRISBOIS:  For the transient?
14 You're talking about the transient?
15          MR. SHAH:  Yes.
16     A.     I want to qualify my statement by
17 saying that, you know, tire wear is really heavily
18 influenced by the way someone operates the vehicle,
19 maintenance the tire pressure and what I can tell you
20 is what I have seen in the field and as a window of
21 wear, let's say or tread life and that has been from
22 approximately 28,000 to 32,000 miles, but again,
23 that -- it can be lower; it can be higher, depending
24 on the way a customer would operate and maintain
25 their vehicle.

153

1     Q.     But with respect to the Turanza, you
2 would expect on average between 28 and 32,000?
3     A.     Yes.
4          (Exhibit Gallacher-17, MOR 00820
5 through 00825, was marked for Identification by the
6 court reporter.)
7     Q.     Mr. Gallacher, you've been handed a
8 six-page document marked Gallacher-17 Bates stamped
9 MOR 00820 through MOR 00825.
10          Can you identify this document?
11     A.     It's an e-mail correspondence between
12 myself and Mr. Thomas Holly, Mr. Volker Hader in
13 regard to E-90 Bridgestone tires.
14     Q.     In -- near the middle under numeric
15 Paragraph 2 --
16     A.     Uh-huh.
17     Q.     You state, and this is a -- take a
18 step back, this is an e-mail dated August 1, 2006,
19 correct?
20     A.     Yes.
21     Q.     You state, "Since the average mileage
22 of the Complaint is approximately 12,300 miles, most
23 customers would only receive 50 percent prorating or
24 one tire."
25          Do you see that?

154

1    A.    Yes.
2    Q.    And at this point, as I understand
3 it, the draft bulletin only contemplated replacement
4 of up to two tires, correct?
5    A.    Yes. That's my best recollection
6 without having the specific document which was
7 attached to this e-mail in front of me.
8    Q.    And I'm just inferring that based
9 upon you saying the prorating of one tire, so...
10        Where did you derive the calculation
11 that the average complaint was occurring
12 approximately 12,300 miles?
13    A.    I believe it simply came from the
14 mileages we recorded.
15    Q.    Have you subsequently come across or
16 obtained in any way any additional data information
17 that would cause you to modify that number in any
18 respect, any material respect?
19    A.    I have not done any further
20 calculations.
21    Q.    In addition to not doing any further
22 calculation, do you have any reason to believe that
23 that number is different than what you state here in
24 August of 2006?
25    A.    Not that I can think of.

155

1    Q.    Moving off of the exhibit, as a
2 general matter, in connection with your role as
3 product engineer of chassis, a role which now
4 includes wheels and tires, what is your -- do you
5 have an understanding with respect to whether or not
6 conventional tires have a -- from a mileage
7 perspective, expect to get more mileage for
8 replacement from a conventional tire versus a
9 run-flat tire?
10    A.    Can you repeat that question?
11    Q.    Absolutely. In fact, I was about to
12 volunteer to do it myself.
13        Do you have an understanding with
14 respect to whether run-flat tread life is generally
15 speaking the same, more than or less than the tread
16 life of a conventional tire?
17    A.    Well, the one thing I'll say is that
18 the rating system that's used for tread wear rating
19 that the tire manufacturers use is the same for --
20 they use the same methodology for run-flat tires and
21 conventional tires. So I would expect that the tread
22 wear rating that they would place on a tire would
23 indicate its tread life more so than the particular
24 construction of the tire.
25    Q.    So as you understand it, if a tread

156

1 wear rating of 280 on a conventional tire and the
2 same tread wear rating of 280 on a run-flat tire, as
3 you understand the rating system should indicate that
4 all other things being equal that you would get the
5 same tread wear life out of each tire, correct?
6    A.    With the stipulation that you were to
7 use or compare those two tires on the same vehicle,
8 and that the two tires you're comparing come from the
9 same manufacturer, I would expect similar mileages.
10    Q.    Do you know an individual named Adam
11 Shaver, S-H-A-V-E-R?
12    A.    I can't say that I do. Do you have
13 his title?
14        MR. BRISBOIS: Just answer the
15 question, Mr. Gallacher. Rather than asking
16 questions. Thanks.
17    Q.    I'm sorry. You said you don't --
18    A.    I can't think of it, no.
19    Q.    What about Lindsey Duffield,
20 D-U-F-F-I-E-L-D?
21    A.    That name is not familiar to me.
22    Q.    Actually, I do have a title, so I
23 will answer your question. Adam Shaver, product
24 planning manager, BMW Group Canada as of April 2007.
25    A.    The name is not familiar to me.

157

1        MR. SHAH: Off the record real quick.
2        (A brief recess was taken.)
3        (Exhibit Gallacher-18 MOR 01108, was
4 marked for Identification by the court reporter.)
5    Q.    Mr. Gallacher, you've been handed a
6 document marked Gallacher-18.
7        Can you identify this document?
8    A.    This is a calculation that I had put
9 together in reference to the bulletin. This is a
10 calculation I put together in reference to the
11 bulletin B-36 06 06.
12    Q.    When did you put this document
13 together?
14    A.    I want to say maybe it was during
15 June or July of 2006 to the best of my recollection.
16    Q.    If I could direct your attention to
17 the three bullet points in the center of the
18 document, the first one says "SOP to November 2005
19 equals 100 percent fitment, Bridgestone, vehicles
20 without support pack."
21        What do you mean by that?
22    A.    It's a projection of what percentage
23 of cars had a Bridgestone tire. It should be
24 clear -- excuse me, Turanza tire.
25    Q.    Okay. And then for November 2005